Richard Eugene DINKINS, Appellant,

v.

The STATE of Texas, Appellee.

No. 71409.

Court of Criminal Appeals of Texas,
En Banc.

Feb. 1, 1995.

Douglas M. Barlow, Beaumont, for appellant.

Tom Maness, Dist. Atty. and John R. De-Witt, Asst. Dist. Atty., Beaumont, Robert Huttash, State's Atty., Austin, for State.

## OPINION

BAIRD, Judge.

Appellant was convicted of capital murder pursuant to Tex.Penal Code Ann.

§ 19.03(a)(6). The jury affirmatively answered the punishment issues submitted pursuant to Tex.Code Crim.Proc.Ann. art. 37.071(b).[1] Punishment was assessed at death. *Id.,* at (e). Appeal to this Court is automatic. *Id.,* at (h). Appellant raises twenty-one points of error. We will affirm.

## I.

On September 12, 1990, at approximately 8:00 p.m., members of the Beaumont Fire Department responded to a fire alarm in a building located at 3420 Fannin Street in Beaumont. John Showman, a Captain with the Beaumont Fire Department, entered the building and located the alarm in the waiting room of a massage therapy office belonging to one of the victims. Showman noticed the air in the room appeared hazy and furniture was strewn around the room as if there had been a struggle. He also noticed a blood-stained, partially broken window opening into another room. He then observed one of the victims, Katherine Thompson, lying injured on the waiting room floor and called to other fire fighters for assistance.[2] As fire fighters rendered medical aid to Thompson, another fire fighter, Mike Randall, peered through the broken window and observed the second victim, Shelly Cutler, sitting on the floor in the second room, injured. Finding the door to the room locked, Randall climbed through the broken window and assessed Cutler's condition. He observed Cutler had been shot in the head. Both victims were transported to a local hospital and shortly thereafter died of their injuries.

While investigating the crime scene, police recovered Thompson's appointment book and a patient application form. The appointment book indicated Thompson had a 7:30 appointment with Cutler and a 6:30 appointment with a Ricky *Dennis.* The book also contained a Lumberton telephone number for Dennis. The patient application form listed a Ricky *Dinkins* along with a different telephone number and a place of employment at the American Valve and Hydrant Company. Because of the similarity of the names, the police attempted to contact the parties listed but discovered both telephone numbers were out of order.

The next day, September 13, Mike Sheffield, a Beaumont police investigator, and Robert Hobbs, a Jefferson County District Attorney investigator, went to appellant's place of employment, American Valve and Hydrant Company, in Beaumont and questioned appellant. In the course of the questioning, the detectives sought consent to search appellant's car but appellant refused. Appellant denied knowing Thompson and denied being in Beaumont the night of the offense. At some point, appellant mentioned he "wanted to talk to someone" and the detectives ceased their questioning. They then arrested appellant on an outstanding misdemeanor warrant and transported him to the Jefferson County Jail.

Later that afternoon, while the detectives were attempting to obtain a search warrant for appellant's car, appellant contacted Sheffield and gave his written consent to search. Appellant also stated that the detectives would find a .357 revolver in the trunk. A search of the car uncovered various items, including a .357 revolver and two boxes of ammunition.

During the morning of September 14, Sheffield and Hobbs interrogated appellant

---

**1.** The instant offense was alleged to have been committed on or about September 12, 1990. Art. 37.071 was amended effective September 1, 1991. All references herein refer to the Code of Criminal Procedure in affect at the time of the offense. At that time art. 37.071(b) provided:

> (b) On conclusion of the presentation of the evidence, the court shall submit the following ... issues to the jury:
> (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

> (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
> (3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

**2.** It is the author's policy to not refer to victims by name. However, because of the factual circumstances of this case, that policy cannot be followed. *See, First v. State,* 846 S.W.2d 836, 837, n. 2 (Tex.Cr.App.1992).

in the Jefferson County District Attorney's Office. During the interrogation, appellant admitted being at the crime scene on the night of the offense. Appellant stated he had attempted to meet with Thompson to discuss some bad checks appellant had written, but was unable to do so because the building was locked. He then heard a fire alarm and observed a black male exit the building and run away. Appellant also stated he had purchased a .357 revolver from Leger's Pistol and Rifle Range in Beaumont. The detectives then obtained appellant's written consent to search various locations, including his locker at work and his home in Sour Lake. Appellant accompanied the detectives as they executed the searches. While searching appellant's home the detectives seized a pair of appellant's blue jeans which appeared to have blood stains on the legs and cuffs. Before returning to Beaumont, the detectives escorted appellant to his grandmother's house where appellant spoke with his grandmother.

Upon returning to Beaumont, the detectives again interrogated appellant. During the interrogation, appellant asked to call his mother in Atlanta, Georgia and the officers complied with the request. After appellant finished speaking with his mother, the detectives appraised him of the evidence linking him to the offense. At this point, appellant agreed to provide a written statement on the condition he could explain the stresses he was under.

In his statement, appellant stated he was twenty-seven years of age and worked as an assembly specialist at American Valve and Hydrant. He professed that he was under considerable stress because of the recent break up of a personal relationship as well as a shoulder injury from work which required frequent medication. Because of his injury, appellant believed his employer was harassing him in an attempt to fire him. He further stated he was having severe financial difficulties and had bounced many checks. On the day of the offense, appellant left work around 1:15 p.m. to go to therapy. He left the doctor's office around 3:00 p.m. or 3:30 p.m. and called his grandmother. After that,

appellant went to his step-sister's home to help her move. At 6:00 p.m., appellant left to go to Thompson's office for a 6:30 p.m. appointment which he had made under the name Ricky *Dennis*. Appellant arrived around 6:45 p.m. or 7:00 p.m. Before entering the building, appellant placed a .25 caliber automatic and a .357 revolver inside a sling he wore for his injured shoulder. Appellant entered the building and met with Thompson in her office. After talking for a while, the two began to argue. As the argument progressed, Thompson pushed appellant towards the door into the waiting room where another woman sat. During the altercation, Thompson struck appellant's injured arm, hurting him. At one point during the altercation, the .25 caliber automatic fell out of appellant's sling. Appellant retrieved the gun, fired a shot, and the gun jammed. The .357 also fell out of appellant's sling and hit the floor. Appellant retrieved the .357 from the floor but maintained he did not remember any other events except for a fire alarm sounding as he ran out the doorway leading into the hall. In the parking lot, appellant's car would not start and appellant had to raise the hood and hit a reset button on the steering column. He then proceeded to drive to his grandmother's house in Sour Lake. At one point, appellant noticed he was no longer wearing his sling. While driving along the highway, he emptied the bullets from the .357 and threw them out the window. Appellant remained at his grandmother's house until 10:00 p.m. or 10:15 p.m. and then drove to his step-sister's house where he remained until 11:00 p.m. Upon arriving home, appellant walked to a pond behind his house and attempted to unjam the .25 caliber automatic. The gun came apart and appellant threw it into the pond. He then went to his room, took some pain medicine, and fell asleep. The next day, before work, appellant drove to his grandmother's house for coffee and took more pain medication. He then went to work where he was later met by Sheffield and Hobbs and subsequently arrested on a hot check warrant. Appellant was indicted for capital murder pursuant to Tex.Penal

Code Ann. § 19.03(a)(6)(A).[3]

At trial, the State presented testimony by William Fincher, the owner of a janitorial service who was at 3420 Fannin Street around 7:30 p.m. on September 12, looking for an employee. Fincher testified he saw appellant looking under the hood of an old model yellow Chevrolet. Shortly thereafter, appellant started the car and drove away.

Louis Leger owner of Leger's Pistol and Rifle Range testified that on September 11, he sold appellant a .357 revolver and two boxes of ammunition, one of .38 caliber bullets and the other of .357 caliber. Matching the serial number on the .357 with the notation in his records, Leger identified the .357 seized in the search of appellant's car as the weapon sold to appellant.

William Showman and Mike Randall testified concerning the circumstances in which they discovered the victims while answering a fire alarm.

Dr. Thomas J. Molina, the pathologist who performed the autopsies, testified Thompson suffered two gunshot wounds, one to her head and the other to her abdomen. Both were fatal. Molina further testified that the stippling on the body indicated that both shots were fired at extremely close range, the abdomen wound resulting from a contact shot. The autopsy of Cutler indicated she died of a single gunshot wound to the head.

William Tatum, a sergent in the identification section of Beaumont Police Department, testified the police recovered an arm sling from the crime scene as well as an appointment book and a client information sheet with appellant's name and place of employment. The police also recovered four lead slugs, either .38 or .357 caliber, and a number of shell casings and lead bullet fragments.[4] Also recovered was a .25 caliber bullet. Tatum further testified that based on the entry point in the wall made by one of the slugs, he surmised Thompson had been either kneeling

or sitting when she had been shot in the head. He also testified that a lead slug was recovered from the doorknob of the door to the room where Cutler was discovered.

Ray Klein, a firearms examiner for the Houston Police Department, testified he conducted ballistics tests on the .357 revolver and the ammunition seized from appellant, as well as the lead slugs, casings and bullet fragments recovered from the crime scene. By comparing the rifling on ammunition test fired in appellant's .357 revolver with the rifling on the slugs recovered from the crime scene, Klein concluded the slugs recovered at the crime scene were fired from appellant's .357 revolver.

Richard Reem, a forensic serologist for the Federal Bureau of Investigation testified he analyzed appellant's blood stained blue jeans and a blood sample taken from Thompson. Based on the sequence of enzymes in Thompson's blood sample, PGM 1 plus, haptoglobin 2 and GC 1–S, Reem determined that the blood on appellant's pants was consistent with · Thompson's blood type. Reem explained that only one person in twenty has the same enzyme sequence in their blood.

In his case-in-chief, appellant presented seven witnesses, each of whom testified essentially that appellant was not aggressive or violent.

The jury found appellant guilty of capital murder.

During the punishment phase, the State presented only two witnesses, Sgt. Tatum, and Detective Hobbs. Tatum testified concerning the details of the murders based on his examination of the crime scene. Tatum testified Thompson was first shot in the abdomen just outside the doorway from the inner office to the waiting room. Comparing the entrance and exit wound in Thompson's body to the position of the bullet entry point in the wall, Tatum surmised Thompson was

---

3. Tex.Penal Code Ann. § 19.03(a)(6)(A) provides:
 (a) A person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this code and:
 (6) The person murders more than one person:
 (A) during the same criminal transaction.

Tex.Penal Code Ann. § 19.02(a)(1)˙provides:
 (a) A person commits an offense if he:
 (1) intentionally or knowingly causes the death of an individual.

4. A fifth lead slug, either a .38 or a .357 caliber, was removed from Cutler during the autopsy.

doubled over when appellant shot her in the abdomen. Tatum further testified that based on the position of one of the bullet entry points in the wall, thirty-one inches off the ground, in relation to Thompson's head wound, appellant shot Thompson a second time as she was either sitting or kneeling on the floor.

Tatum also testified concerning the details of Cutler's murder. Tatum testified the bullet in the doorknob of the room in which Cutler was found was fired after Thompson was shot. He stated this revealed appellant's attempt to get to Cutler after she locked herself in the room. A wicker shelf which covered an unused receptionist window looking into the room had been removed and the window glass broken. Tatum speculated the blood covering the unbroken glass came from appellant's hands as he attempted to break the window. Tatum also testified the telephone in the room was off the hook when Cutler was discovered, indicating she was attempting to make a telephone call before being shot. Tatum concluded it was possible for someone to reach through the window and shoot Cutler as she crouched on the floor.

Detective Hobbs testified about appellant's demeanor during the investigation. He stated appellant was emotionless when initially interrogated and showed no concern that he was suspected in a capital murder. Further, appellant appeared to be unconcerned during much of his subsequent interrogations.

In his defense, appellant presented several character witnesses. One witness, a Jefferson County Sheriff's Department lieutenant assigned to jail duty testified he was acquainted with appellant from his year and a half incarceration pending trial and, during that time, appellant had no disciplinary problems. He further stated that appellant had, at one point, reported a possible jail break.

Nine other witnesses also testified on behalf of appellant each testifying, in essence, that the murders were aberrations in appellant's normally non-violent character. Further, each expressed the belief appellant was unlikely to commit future acts of violence.

The jury affirmatively answered the three statutory punishment issues and the trial judge sentenced appellant to death.

We now turn to appellant's points of error.

## II.

In his first two points of error, appellant contends the trial judge erred by refusing to set aside the indictment because it failed to allege the offense of capital murder. Specifically, appellant complains the indictment failed to assert a culpable mental state in alleging the second murder and therefore failed to allege a capital murder. The indictment read, in pertinent part:

> ... RICHARD EUGENE DINKINS ... did then and there intentionally and knowingly cause the death of an individual, KATHERINE THOMPSON, by shooting her with a deadly weapon, to·wit: a firearm; and the said RICHARD EUGENE DINKINS did then and there cause the death of an individual, SHELLY CUTLER, by shooting her with a deadly weapon, to-wit: a firearm, and both of said murders were committed during the same transaction.

In general, an indictment must plead every element which must be proven at trial. *Whitehead v. State*, 745 S.W.2d 374, 376 (Tex. Cr.App.1988) (citing *Harrell v. State*, 643 S.W.2d 686 (Tex.Cr.App.1982); and, *Vinson v. State*, 626 S.W.2d 536, 537 (Tex.Cr.App. 1981)). Naturally, this includes the culpable mental state of the offense. *Thompson v. State*, 697 S.W.2d 413, 415 (Tex.Cr.App.1985). If an indictment fails to allege a culpable mental state for an offense, it is defective and is subject to a motion to quash. *Id.* See also, *Swope v. State*, 805 S.W.2d 442, 444 (Tex.Cr.App.1991).

Nevertheless, we have consistently held the State is not required to allege the constituent elements of an offense constituting the aggravating feature of a capital murder, even in the face of a motion to quash. *Barnes v. State*, 876 S.W.2d 316, 323 (Tex.Cr. App.1994); *Hathorn v. State*, 848 S.W.2d 101, 108–109 (Tex.Cr.App.1992); *Ramirez v. State*, 815 S.W.2d 636, 642 (Tex.Cr.App.1991); *Trevino v. State*, 815 S.W.2d 592, 619 (Tex.

Cr.App.1991); *Beathard v. State*, 767 S.W.2d 423, 431 (Tex.Cr.App.1989); *Marquez v. State*, 725 S.W.2d 217, 236 (Tex.Cr.App.1987); *Hogue v. State*, 711 S.W.2d 9, 14 (Tex.Cr.App.1986); *Andrade v. State*, 700 S.W.2d 585, 589 (Tex.Cr.App.1985); *Hammett v. State*, 578 S.W.2d 699, 708 (Tex.Cr.App.1979); *and, Smith v. State*, 540 S.W.2d 693, 697 (Tex.Cr.App.1976). Consequently, we hold that in the case presently before us, the indictment was not defective for failing to allege a culpable mental state of the second murder. **Appellant's first and second points of error are overruled.**

### III.

In his third point of error, appellant contends the jury charge erroneously authorized a conviction of capital murder without requiring that the second murder be committed intentionally or knowingly as required by § 19.03(a)(6). For the following reasons, we disagree.

■ In contrast to the indictment, which serves a notice function to the defendant, the function of the jury charge is to instruct the jury on the law applicable to the case. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex.Cr.App.1994); *Benson v. State*, 661 S.W.2d 708, 713 (Tex.Cr.App.1982); *and, Williams v. State*, 547 S.W.2d 18, 20, 22 (Tex.Cr.App.1977). Because the charge is the instrument by which the jury convicts, *Benson*, 661 S.W.2d at 715, the charge must contain an accurate statement of the law and must set out all the essential elements of the offense.

*Id.*, 661 S.W.2d at 713; *and, Zuckerman v. State*, 591 S.W.2d 495, 496 (Tex.Cr.App.1979).

■ When we review a charge for alleged error, we must examine the charge as a whole instead of a series of isolated and unrelated statements. *Holley v. State*, 766 S.W.2d 254, 256 (Tex.Cr.App.1989); *and, Inman v. State*, 650 S.W.2d 417, 419 (Tex.Cr.App.1983). Capital murder and murder were defined in the abstract portion of the charge,[5] but the application portion did not allege a culpable mental state for the second murder. The application portion permitted the jury to convict if it found appellant

> ... intentionally or knowingly cause[d] the death of KATHERINE THOMPSON, by shooting her with a deadly weapon, to-wit: a firearm; and the said [appellant] did then and there cause the death of an individual, SHELLY CUTLER, by shooting here with a deadly weapon, to wit: a firearm, and *both of said murders* were committed during the same criminal transaction, you shall find the defendant guilty of the offense of Capital Murder.

The application portion permitted the jury to convict appellant of capital murder only if it found both killings were murders. "Murder" is a term of art which is defined in the Penal Code. *See*, § 19.02(a)(1); *and*, § 19.03. The abstract portion of the charge provided that definition. *See*, n. 5, *supra*. Thus, the jury was instructed that a person commits capital murder only if both killings were committed intentionally or knowingly.[6] *See, Vuong v.*

---

5. The abstract portion of the charge defined "capital murder" and "murder" as follows:
Capital Murder:
 A person commits Capital Murder if he commits Murder, and the person murders more than one person during the same criminal transaction.
Murder:
 A person commits Murder if he intentionally or knowingly causes the death of an individual.

6. Citing *Almanza v. State*, 686 S.W.2d 157 (Tex. Cr.App.1985), the dissent contends the conviction should be reversed because appellant suffered "some harm" from the omission of a culpable mental state for the second murder in the application paragraph. Dissenting Op., 894 S.W.2d 362. However, as noted above, the abstract portion of the charge defined "murder" as intentionally or knowingly causing the death of an individual. *See*, n. 5, *supra*. The charge

further instructed the jury that a conviction for capital murder required a finding that the defendant committed two or more "murders." Thus, the jury was not authorized to convict unless it found appellant committed two "murders" as defined in the abstract portion of the charge. Nevertheless, the dissent maintains "there is a genuine *possibility* the jury did not feel obliged to find the second murder was committed intentionally or knowingly ..." Dissenting Op., 894 S.W.2d at 362. (emphasis added). It is difficult to imagine how such a possibility could arise when the only definition of murder required its intentional or knowing commission. In any event, there must be more than a mere *possibility* of harm to meet the "some harm" standard enunciated in *Almanza*; the "defendant must have suffered 'some' *actual, rather than theoretical*, harm from the error." *Arline v. State*, 721 S.W.2d 348, 351 (Tex.Cr.App.1986) (citing *Al-*

*State,* 830 S.W.2d 929, 941 (Tex.Cr.App.1992). Consequently, the jury charge was not defective. **Appellant's third point of error is overruled.**

## IV.

In his fourth and fifth points of error, appellant contends § 19.03(a)(6) is both unconstitutional on its face and as applied. Because we will only entertain challenges to the constitutionality of a statute as it applies to a particular defendant, *McBride v. State,* 862 S.W.2d 600, 610–611 (Tex.Cr.App.1993); *and, James v. State,* 772 S.W.2d 84, 91 (Tex.Cr. App.1989), *vacated,* 493 U.S. 885, 110 S.Ct. 225, 107 L.Ed.2d 178 (1989), *affirmed,* 805 S.W.2d 415 (Tex.Cr.App.1990), we need only address appellant's latter point of error.

Relying on *First v. State,* 846 S.W.2d 836 (Tex.Cr.App.1992), appellant contends § 19.03(a)(6) is unconstitutional because the statute, as incorporated in "the application paragraph of the charge did not allow the jury to find whether or not appellant actually committed the intentional or knowing [second] murder." [Appellant's Brief, pg. 20]. Appellant claims this violates the Eighth Amendment's prohibition against the arbitrary and capricious application of the death penalty because it permits the imposition of a death sentence when the aggravating offense does not rise to an intentional murder. He further claims the statute is unconstitutionally vague because it can be interpreted to either dispense with the *mens rea* requirement for the second murder or to require both murders to be committed intentionally or knowingly.

Much of appellant's argument was addressed in our resolution of the third point of error. Although the application paragraph did not allege a culpable mental state with regard to the second murder, the application paragraph, as well as the definitional portion of the charge, required a jury to find that both killings were "murders" in order for the offense to be capital murder. The definitional portion of the charge defined "murder" as intentionally or knowingly causing the death

of an individual. Thus, the charge did not permit the jury to convict appellant unless they found both killings were committed either intentionally or knowingly. *See, Vuong,* 830 S.W.2d at 941.

Moreover, appellant's reliance on *First* is misplaced because *First* addressed a punishment issue under art. 37.071. *Id.,* 846 S.W.2d at 838. In *First,* the jury charge was defective because it did not permit the jury to consider the provocation of the second deceased, thereby preventing the jury from considering a mitigating circumstance. *Id.,* at 842. In the instant case, the jury was instructed in the definitional portion that it was not to convict appellant of capital murder unless it first determined both murders had been committed intentionally or knowingly.

Further, we find no merit in appellant's vagueness claim because the Penal Code adequately limits those acts which constitute "murder." The Code Construction Act provides that words having a technical or particular meaning must be construed according to that meaning. Tex.Gov't Code Ann. § 311.011(b) (Vernon 1988). The Penal Code section which prohibits capital murder, § 19.03(a), further limits the kind of murder which may form the basis of a capital offense, namely, murder pursuant to § 19.02(a)(1). Finally, nowhere in our review of § 19.03(a)(1)–(a)(6) do we find an indication that any type of homicide other than murder under § 19.02(a)(1) will suffice to form the basis of a capital offense. Therefore, we hold § 19.03(a)(6) is not unconstitutionally vague for failure to specify a culpable mental state for the second homicide. **Accordingly, appellant's fourth and fifth points of error are overruled.**

## V.

In his sixth point of error, appellant contends he had the right to be tried pursuant to the amended version of art. 37.071, which

*manza,* 686 S.W.2d at 171) (emphasis added). *See also, Kelly v. State,* 748 S.W.2d 236, 239 (Tex.Cr.App.1988); *Haggins v. State,* 785 S.W.2d

827, 828 (Tex.Cr.App.1990); *and, Cook v. State,* 884 S.W.2d 485, 492 (Tex.Cr.App.1994).

was applicable to offenses committed after September 1, 1991.[7] He also contends in the seventh point of error that the trial judge erred in declaring a mistrial after learning the venire had been instructed pursuant to the amended version of art. 37.071(b).

The offense for which appellant was charged allegedly occurred on September 12, 1990. During voir dire, the State and appellant discussed legal principles with the veniremembers based upon the amended version of art. 37.071 which applied only to offenses occurring *after* September 1, 1991. At one point in the proceedings, the State advised the trial judge that it believed any prosecution under the amended art. 37.071 would be void. Appellant expressed his desire to proceed under the amended statute and refused to consent to a mistrial. The trial judge then declared a mistrial over appellant's objection. Following a second voir dire, appellant filed a motion to declare the pre-amended art. 37.071 unconstitutional and also elected to be tried under the amended art. 37.071. The trial judge denied appel-

lant's motion. Appellant re-urged his motion at the conclusion of trial and requested the jury be instructed according to the amended version of art. 37.071 but the trial judge again refused.

Appellant concedes that our holding in *Nichols v. State,* 754 S.W.2d 185, 204 (Tex. Cr.App.1988), belies his claim that he had the right to elect to be prosecuted under the amended statute.[8] He adds a constitutional dimension to his claim, however, by raising an Equal Protection challenge under the United States and Texas Constitutions. Appellant claims he was denied Equal Protection because he was denied the broader provisions of the amended statute which were available to those defendants who committed capital murder after September 1, 1991.

■ We need only address appellant's Federal claim because appellant failed to raise his State claim at trial. Under the Equal Protection Clause of the Fourteenth Amendment, when a classification does not implicate a "fundamental" right,[9] or place a

---

7. Prior to September 1, 1991, Tex.Code Crim. Proc.Ann. art. 37.071 provided in pertinent part:

 \* \* \* \* \* \*

(b) On conclusion of the presentation of the evidence, the court shall submit the following three issues to the jury:
 (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
 (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
 (3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

In response to the Supreme Court's decision in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the Legislature amended art. 37.071 to read, in pertinent part:

[Sec. 2](b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:
 (1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; ...

 \* \* \* \* \* \*

[Sec. 2](e) The court shall instruct the jury that if the jury returns an affirmative finding to

each issue submitted under Subsection (b) of this article, it shall answer the following issue:
 Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

Acts 1991, 72nd Leg., ch. 838, § 9, eff. Sept. 1, 1991.

8. In *Nichols,* we held subsection (e) of art. 37.071 could not be applied retroactively where the defendant's first trial was held before the effective date of the amendment. *Id.,* 754 S.W.2d at 204. We based this holding on the general principle that, absent express Legislative command, statutes are not to be applied retroactively. *Id. See also, Ridyolph v. State,* 545 S.W.2d 784, 786–787 (Tex.Cr.App.1977).

9. "Fundamental" rights have been held to include the right to privacy, the right to vote, the right to procreate, the right to travel, and those rights guaranteed by the First Amendment. *Clark v. State,* 665 S.W.2d 476, 480–481, n. 3 (Tex.Cr.App.1984) (citing *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 312, n. 3, 96 S.Ct. 2562, 2566, n. 3, 49 L.Ed.2d 520 (1976)).

burden on a "suspect" class of persons,[10] the proper standard for review is to determine whether there is a rational basis for the different treatment, which is to say, whether the classification bears a rational relationship to a legitimate state interest. *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *Clements v. Fashing,* 457 U.S. 957, 963, 102 S.Ct. 2836, 2843, 73 L.Ed.2d 508 (1982); *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–2517, 49 L.Ed.2d 511 (1976); *James v. State,* 772 S.W.2d 84, 92 (Tex.Cr.App.1989); *and, Clark v. State,* 665 S.W.2d 476, 480–481 (Tex.Cr.App.1984). "Rational basis" review is highly deferential towards the States when economic or social legislation is at issue. *Dallas v. Stanglin,* 490 U.S. 19, 26–27, 109 S.Ct. 1591, 1594–1595, 104 L.Ed.2d 18 (1989); *and, Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254. Courts also defer to penal legislation. *See, McGowan v. Maryland,* 366 U.S. 420, 422–428, 81 S.Ct. 1101, 1103–1106, 6 L.Ed.2d 393 (1961). Accordingly, a reviewing court should not strike down a classification unless it is "based solely on reasons totally unrelated to the pursuit of the State's goals and only if no grounds can be conceived to justify them." *Clements,* 457 U.S. at 963, 102 S.Ct. at 2843. *See also, John v. State,* 577 S.W.2d 483, 485 (Tex.Cr.App.1979) ("A legislative body has a right to make a classification ... for the purpose of serving legitimate aims if the limits of the class are not unreasonable or arbitrary."); *and,* Rotunda & Nowak, *Treatise on Constitutional Law: Substance and Procedure,* 2nd, § 18.3, p. 27 (1992).

Neither the Supreme Court nor this Court has recognized criminal defendants in general as constituting a suspect class. Therefore, appellant's claim is subject to rational basis review unless he shows he was deprived of a fundamental right when he was prosecuted under the pre-amended version of art. 37.071. We find no fundamental right at issue. Art. 37.071 was amended by the Legislature in light of *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), in which the Supreme Court held art. 37.071, as applied to Penry, violated the Eighth and Fourteenth Amendments because it did not permit the jury to consider and give effect to evidence which mitigated against a sentence of death. *See Id.,* 492 U.S. at 315–328, 109 S.Ct. at 2945–2952. *Penry,* however, did not wholly invalidate art. 37.071. Indeed, we have repeatedly rejected *Penry* challenges to the pre-amended art. 37.071, holding the statute permitted the jury to fully consider evidence which mitigated against the death penalty. *See, Zimmerman v. State,* 860 S.W.2d 89, 101–102 (Tex. Cr.App.1993); *Gunter v. State,* 858 S.W.2d 430, 445–447 (Tex.Cr.App.1993); *Beavers v. State,* 856 S.W.2d 429, 433 (Tex.Cr.App.1993); *Delk v. State,* 855 S.W.2d 700, 709 (Tex.Cr. App.1993); *Robinson v. State,* 851 S.W.2d 216, 236 (Tex.Cr.App.1993) (Op. on reh'g); *Ex parte Harris,* 825 S.W.2d 120, 122 (Tex. Cr.App.1991); *Earhart v. State,* 823 S.W.2d 607, 632–633 (Tex.Cr.App.1991); *Lewis v. State,* 815 S.W.2d 560, 567 (Tex.Cr.App.1991); *Ex parte Ellis,* 810 S.W.2d 208, 212 (Tex.Cr. App.1991); *and, Ex parte Baldree,* 810 S.W.2d 213 (Tex.Cr.App.1991). Thus, it is clear the Eighth Amendment is not violated by sentencing a convict under pre-amended art. 37.071 unless the jury is precluded from considering and giving effect to mitigating evidence. *Satterwhite v. State,* 858 S.W.2d 412, 425–426 (Tex.Cr.App.1993). In the instant case, appellant does not contend, nor does the record suggest, the jury was unable to consider and give effect to his mitigating evidence under the statutory punishment issues which applied at the time of his trial. Consequently, we hold appellant's right to Equal Protection under the Fourteenth Amendment was not violated by prosecuting him under pre-amended art. 37.071.[11]

---

10. "Suspect" classifications have been held to be classifications based upon race, national origin, gender, or illegitimacy. Rotunda & Novak, *Treatise on Constitutional Law: Substance and Procedure,* 2nd, § 18.3, p. 22 (1992).

11. The dissent asserts that this discussion is unnecessary because the amended art. 37.071 may not be applied retroactively. Dissenting Op., 894 S.W.2d at 363. The dissent errs in reading appellant's point of error as making a statutory claim for retroactive application of the amended statute. Rather, appellant contends he is being denied his Constitutional right to equal protection because defendants who committed their capital crimes before the amendment of art.

We next move to appellant's seventh point of error contending the trial judge erred by declaring a mistrial *sua sponte* after being notified the litigants had used erroneous legal principles during the *voir dire.* Although he concedes jeopardy had not attached at the time the judge declared the mistrial, appellant nevertheless contends no manifest necessity existed to justify a mistrial. We believe appellant's legal analysis is incorrect. The doctrine of manifest necessity is inextricably fused with the concept of jeopardy and is based upon the principle that once a jury is impaneled and sworn, but for a few limited exceptions, a defendant has the right to have his guilt or innocence resolved by that particular jury. *Oregon v. Kennedy,* 456 U.S. 667, 671–672, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416 (1982); *Arizona v. Washington,* 434 U.S. 497, 503–507, 98 S.Ct. 824, 829–830, 54 L.Ed.2d 717 (1978); *United States v. Jorn,* 400 U.S. 470, 479–481, 91 S.Ct. 547, 554–555, 27 L.Ed.2d 543 (1971); *and, United States v. Perez,* 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824). *See also, Alvarez v. State,* 864 S.W.2d 64, 65 (Tex.Cr.App.1993). Where, as in the instant case, the jury has neither been impaneled nor sworn, jeopardy principles do not prevent a trial judge from declaring a mistrial. *See, Fields v. State,* 627 S.W.2d 714, 720 (Tex.Cr.App.1982). **Appellant's sixth and seventh points of error are overruled.**

## VI.

In his eighth point of error, appellant contends the trial judge erred in restricting the voir dire examination of a venireman concerning reasonable doubt. During individual voir dire of venireman Smith by defense counsel, the following exchange occurred:

[Appellant]: I think the Court will instruct you—now have a definition of reasonable doubt. We haven't for a long time, but last November the Court of Criminal Appeals gave us a definition that includes this statement. A reasonable doubt is the kind of doubt that would make a reasonable person hesitate to act

in the most important of his affairs. Okay?

[Venireman]: (Nodding head)

Q: Would you consider sitting on the jury in a capital murder case the most important of your affairs?

A: Yes, I guess.

Q: That is. That's the most important kind of—

A: Um hum.

Q: —jury service you can render. So if you have the kind of doubt at the punishment phase of a trial that would cause you to hesitate to answer those questions yes, how are you going to answer them?

A: Be no.

Q: Okay. At the punishment phase of this trial, if you have the kind of doubt that would make you hesitate to answer those questions yes, what would your oath require you to do?

[The State]: I'll object to that, Your Honor. His oath does not require him to not hesitate to answer the question.

[The Court]: Sustain the objection.

[Appellant]: At the conclusion of this juror, could I read my questions into the record again, Your Honor?

[The Court]: Sure.

[Appellant]: Okay.

In a hearing following the examination of venireman Smith, defense counsel contended his questioning of Smith was proper.

[Appellant]: Okay. Your Honor, the prosecutor has asked almost all of the potential jurors that if the State proves it to them beyond a reasonable doubt, they are going to answer these questions yes, and if they don't prove it to them, are they going to answer them no. My questions deal with the definition of reasonable doubt. And under the law, and I believe the Court will instruct them that if they have a doubt that would make a reasonable person hesitate to answer those questions yes, then their

37.071 are not entitled to the broader provisions of the amended statute. Consequently, the foregoing analysis is necessary to determine whether

appellant had a constitutional right to avail himself of the amended statute.

oath requires them to answer no. And that's what I'd like to ask this juror about is if they had that kind of doubt that falls under that definition of reasonable doubt, are they going to follow their oath and answer the questions no, are they going to answer them yes, in contradiction to their oath.

[The Court]: State?

[The State]: I don't believe that's what the definition of reasonable doubt in conjunction with the oath requires, Judge. I think that this is in here as an example of the kind of doubt, and I don't think that it goes to the specifics of the particular case, where if the juror says, you know, well, we need to think about this a little while, that that's the hesitation that to follow their oath, they have to automatically then answer these questions no. I think because the statement starts out it is the kind of doubt. It's giving that as an example. It's not meant to be specific to their deliberations as a juror. And he's giving this juror a false impression when he tells him that to follow his oath, if he has any kind of hesitation, to answer the question, then he's got to answer it no. I think it's misleading. I think, in fact in the past the defense attorney has asked similar questions, but not tied them to the oath. And I think those questions were proper. But I think when he says he's required by his oath to automatically, if on any hesitation answer the question a specific way. That's improper.

[The Court]: Okay. And you are saying he should not be allowed to ask that question about reasonable doubt?

[The State]: No, sir. That's not what I'm saying. I have not objected in the past to some fairly lengthy and confusing questions about reasonable doubt. My problem with it is when he makes it specific to the answer and says that he's required by his oath, that if he hesitates in any manner that he's got to then answer the question no. And you know, there could be any number of reasons to hesitate. And once again, this is by way

of example and not by way of a specific order to the juror.

[The Court]: That's fine. I'll keep it out. If I'm wrong, you got a free shot.

Bring him back.

We're through.

[Appellant]: On that particular issue you would rule—

[The Court]: Yes, sir. I'm going with the State, and we'll find out.

[Appellant]: So the State's objection is sustained, Your Honor?

[The Court]: Yes, sir.

[Appellant]: And I'll not be allowed to ask those questions?

[The Court]: That's correct.

Appellant contends he was entitled to question venireman Smith concerning his understanding of "reasonable doubt" to determine if he could properly apply the law. The State claims appellant's linking his definition of reasonable doubt with the juror's oath, Tex.Code Crim.Proc.Ann. art. 35.22, was improper because it misled the juror into believing he was obligated to answer the punishment issues "no" without deliberating over the evidence. We disagree.

 We have long acknowledged that voir dire is an integral part of defense counsel's role in providing adequate legal assistance because it allows counsel to intelligently exercise peremptory challenges and challenges for cause during the jury selection process. *McCarter v. State,* 837 S.W.2d 117, 120 (Tex.Cr.App.1992); *Ex parte McKay,* 819 S.W.2d 478, 482 (Tex.Cr.App.1990); *Gardner v. State,* 730 S.W.2d 675, 689 (Tex.Cr.App. 1987); *Graham v. State,* 566 S.W.2d 941, 953 (Tex.Cr.App.1978); and, *Naugle v. State,* 118 Tex.Crim. 566, 40 S.W.2d 92, 94 (App.1931). In order to effectuate a defendant's ability to select a fair and impartial jury the scope of voir dire is broad, *McKay,* 819 S.W.2d at 482; and, *Guerra v. State,* 771 S.W.2d 453, 467 (Tex.Cr.App.1988), and a defendant is generally entitled to voir dire prospective jurors on any matter which will be an issue at trial. *McCarter,* 837 S.W.2d at 121; *Nunfio v. State,* 808 S.W.2d 482, 484 (Tex.Cr.App.1991); and, *Shipley v. State,* 790 S.W.2d 604, 608 (Tex.Cr.App.1990). This includes a venire-

man's understanding of the term "reasonable doubt." *Lane v. State,* 828 S.W.2d 764, 766 (Tex.Cr.App.1992); *and, Woolridge v. State,* 827 S.W.2d 900, 906 (Tex.Cr.App.1992).

■ We review a trial judge's decision to limit voir dire for an abuse of discretion, *Nunfio,* 808 S.W.2d at 484; *and, Allridge v. State,* 762 S.W.2d 146, 163 (Tex.Cr.App.1988), and a trial judge abuses his discretion when he limits a proper question concerning a proper area of inquiry. *Gardner,* 730 S.W.2d at 689; *and, Powell v. State,* 631 S.W.2d 169, 170 (Tex.Cr.App.1982). A trial judge may limit a defendant's voir dire under specific circumstances: where a question commits a venireman to a specific set of facts, *White v. State,* 629 S.W.2d 701, 706 (Tex.Cr.App.1981); where the questions are duplicitous or repetitious, *Guerra,* 771 S.W.2d at 467; where the venireman has already stated his position clearly and unequivocally, *Id.,* at 468 (citing *Phillips v. State,* 701 S.W.2d 875, 889 (Tex. Cr.App.1985)); and, where the questions are not in proper form, *Adams v. State,* 577 S.W.2d 717, 724 (Tex.Cr.App.1979).

■ A venireman is subject to a challenge for cause by the State, or by a defendant if he is unable to follow the law. *See,* Tex.Code Crim.Proc.Ann. art. 35.16(b)(3) and (c)(2). *See also, Little v. State,* 758 S.W.2d 551, 555 (Tex.Cr.App.1988) (holding State to higher standard of proof subjects venireman to challenge for cause); *Felder v. State,* 758 S.W.2d 760, 766 (Tex.Cr.App.1988) (inability to consider parole when deciding punishment); *Nichols v. State,* 754 S.W.2d 185, 197 (Tex.Cr.App.1988) (inability to assess guilt under law of parties); *Smith v. State,* 683 S.W.2d 393, 398–399 (Tex.Cr.App.1984) (inability to consider minimum range of punishment); *and, Esquivel v. State,* 595 S.W.2d 516, 526 (Tex.Cr.App.1980) (requiring State prove motive). We do not believe appellant's question misled the venireman into believing he was obligated to answer the special issues without pausing to deliberate. Appellant essentially re-phrased his previous question concerning how the venireman would answer the special issues if he had a reasonable doubt as to the evidence. Phrasing the question in the context of the juror's oath did not preempt the venireman's prospective reflec-

tion upon the evidence presented at trial. Therefore, we hold the question was proper and the trial judge abused his discretion by excluding it.

■ Although harm is generally presumed when a trial judge improperly limits voir dire, *Nunfio,* 808 S.W.2d at 485, we find no harm in this case because jury selection concluded prior to reaching venireman Smith. Smith was the 53rd venireman. However, jury selection concluded when the 45th venireman was selected. Thus, the limitation of appellant's voir dire did not affect his ability to intelligently exercise his peremptory challenges and challenges for cause. *See, Ratliff v. State,* 690 S.W.2d 597, 600 (Tex.Cr.App.1985) (citing *Thomas v. State,* 658 S.W.2d 175 (Tex.Cr.App.1983); *and, Whitaker v. State,* 653 S.W.2d 781 (Tex.Cr. App.1983)). **Appellant's eighth point of error is overruled.**

Appellant contends in his ninth point of error that the trial judge erred by restricting the voir dire examination of venireman Kyle regarding his views towards the death penalty. During voir dire, appellant questioned Kyle about the circumstances where death would be an appropriate punishment:

> [Appellant]: And ... you realize if you find a person guilty of capital murder, you've only got two choices of punishment.
>
> [Venireman]: I understand that.
>
> Q: By your answer on your questionnaire indicates it's just murder not necessarily even capital murder should always be required to face the death penalty. Is that still your impression?
>
> A: (Pause) I—I've thought a lot about that.
>
> Q: Okay.
>
> A: Like I tried to say anything, capital murder, you know, I think in some circumstances the death penalty should be in effect. Now just murder, I'm kind of leaning toward maybe not, you know, capital punishment. But, you know, capital murder, I could lean toward the death penalty. I believe in it rather. Under certain circumstances. Some cir-

cumstances if it's capital murder, I wouldn't go with the death penalty.

Q: *Okay. What would those circumstances be? You got any ideas?*

[The State]: Your Honor, at this time, I'll object, [Defense Counsel] is trying to bind Mr. Kyle to a verdict.

[The Court]: Sustain the objection.

[Appellant]: So there are those cases of capital murder that you would not think a person should have the death penalty.

A: I believe so.

Q: But are you—your also telling me that there are cases of just murder that you would believe that you might want to give somebody the death penalty?

A: According to the situation, I might.

Q: You realize the law says you can't do that?

A: Um hum.

Q: Though you know the law says you can't do that, you would still want to?

A: Not necessarily said I want to, you know, I'm gonna always go by the law. The law is the law. And you know like I said, the circumstances, you know, to me. I just don't want to give the death penalty to everybody that commit murder, you know, no.

Q: How about everybody that commits capital murder?

A: No.

Q: Don't want to do that?

A: Not just everybody that come along, okay, capital murder, death penalty, murder, death penalty. No.

Q: You going to give it a lot of thought?

A: Yeah, I really been giving a lot of thought with a lot of questions. This the first time it ever been brought up to me, in many different ways, and I got a lot of opinions on the death penalty, and I thought about it a lot, yes, I have.

Q: What is your opinion on the death penalty.

A: Basically, I believe in the death penalty, but like I say, I wouldn't just give the death penalty to somebody because they committed a capital murder. It—it's up to the circumstances of what happened in a murder.

Q: Okay. Anything else.

A: No.

Q: Nothing else. You wouldn't consider any other kind of evidence?

A: Oh, I'd consider all the evidence. All the evidence that comes in, I'd consider every fact. I'd consider every fact, I just wouldn't look at maybe the first thing that they was saying, say, well, okay, well, I believe that, yeah. That could be true of capital murder and in the death penalty, you know. I'd consider everything that both sides say, questions and, you know, consider everything before I'd—I'd put somebody's life on the line. I got to be the most positive man in the world.

Q: And there are those capital murder cases that you think life imprisonment would be an appropriate punishment?

A: Yes.

Q: Is that right?

A: Yes, sir.

Q: Okay. Question number one. And we're going over these questions again with [the prosecutor] a moment ago?

A: Yes, sir.

Q: Okay. If you found some guilty of capital murder, would you always answer this first question yes?

A: (Pause) If they was found of capital murder, would I always answer yes?

Q: Yes, sir.

A: Not necessarily.

Q: You can conceive of an idea in your mind where there may be an appropriate time to answer that question no? You can think of circumstances that you might answer that question no?

A: Yes, sir.

Q: Okay. *What would the circumstances be? Can you think of one particular—*

[The State]: Objection, Your Honor. Again, [appellant] is trying to bind Mr. Kyle to a verdict based on some facts.

[The Court]: Sustain the objection.

[Appellant]: Your Honor, I'm not trying to bind him, I'm just trying to see how is

thinking and what he might be looking for.

[The Court]: I understand. The ruling is still the same.

 The voir dire in the instant case is similar to that in *Boyd v. State*, 811 S.W.2d 105, 119 (Tex.Cr.App.1991), wherein defense counsel was prevented from asking a prospective venireman to explain "what ... is a case that is proper for the death penalty to be imposed?" We held the trial judge did not abuse his discretion in excluding the question because the question committed the venireman to a particular fact situation. *Id.*, at 120 (citing *Allridge*, 762 S.W.2d at 162–164; *and, Cuevas v. State*, 742 S.W.2d 331, 336, n. 6 (Tex.Cr.App.1987)). The question in the instant case is indistinguishable from that in *Boyd*. **Therefore, appellant's ninth point of error is overruled.**

### VII.

In his tenth and eleventh points of error appellant contends the trial judge erred in admitting hearsay evidence. The police discovered in Thompson's office an appointment book containing the name Ricky *Dennis*, and a patient application form listing the name Ricky *Dinkins* which were later tendered into evidence over appellant's objection. Detective Sheffield testified appellant became a suspect in the investigation based upon the appointment book and application form. Appellant argues the appointment book and application form constitute inadmissible hearsay.

 Hearsay is a statement, including a written statement, other than one made by the declarant while testifying at the trial, which is offered to prove the truth of the matter asserted. *See,* Tex.R.Crim.Evid.

801(d); *Schaffer v. State*, 777 S.W.2d 111, 115 (Tex.Cr.App.1989); *Barnard v. State*, 730 S.W.2d 703, 723 (Tex.Cr.App.1987); *and, McKay v. State*, 707 S.W.2d 23, 33 (Tex.Cr.App.1985). An extrajudicial statement or writing which is offered for the purpose of showing *what* was said rather than for the *truth* of the matter stated therein does not constitute hearsay. *Crane v. State*, 786 S.W.2d 338, 351 (Tex.Cr.App.1990); *Porter v. State*, 623 S.W.2d 374, 385 (Tex.Cr.App.1981); *and, Nixon v. State*, 587 S.W.2d 709, 711 (Tex.Cr.App.1979). In *Gholson v. State*, 542 S.W.2d 395, 398 (Tex.Cr.App.1976), we explained "[a]n extra-judicial statement or writing may be admitted as circumstantial evidence from which an inference may be drawn, and not for the truth of the matter stated, therein, without violating the hearsay rule."

We addressed a similar issue in *Jones v. State*, 843 S.W.2d 487 (Tex.Cr.App.1992). While testifying at trial, a police officer repeated several out-of-court statements by another witness which implicated the defendant. The officer explained that he began to suspect the defendant and ultimately obtained an arrest warrant based upon those statements. *Id.*, at 499. We held the extrajudicial statements were not inadmissible hearsay because they were admitted not to prove the truth of the matter asserted, but rather to explain how the defendant came to be a suspect. *Id.*

 The instant case is controlled by *Jones*. The State tendered the appointment book and the application form to show how appellant became a suspect in the investigation. Therefore, we hold the appointment book and the patient application form were not inadmissible hearsay.[12] **Appellant's**

---

12. Despite the clear applicability of *Jones, supra,* to the instant case, the dissent contends the appointment book and the patient application form should have been excluded as hearsay because they permitted the jury to draw the inference appellant met with Thompson the night of the offense. Dissenting Op., 894 S.W.2d at 364. However, this type of inference is permissible; an out-of-court statement may be admitted as circumstantial evidence from which an inference may be drawn without violating the prohibition against hearsay. *Gholson,* 542 S.W.2d at 398.

The dissent further contends the documents should have been excluded because the State, by not articulating the basis for admitting the evidence, failed to establish the relevancy of the evidence as required by Tex.R.Crim.Evid. 401. *Id.* However, appellant did not object to the relevancy of the evidence at trial and does not contend on appeal that the evidence was irrelevant. Consequently, we need not and should not address relevancy here.

tenth and eleventh points of error are overruled.

## VIII.

In his twelfth point of error, appellant contends the trial judge erred in admitting appellant's written confession because the statement was involuntary, resulting from Sheffield's advice that it could be used "for or against" appellant.

■ It is well settled that a confession is not admissible if the uncontradicted evidence shows the person who obtained the confession informed the accused that his confession might be used "for or against" him. *Sterling v. State*, 800 S.W.2d 513, 518–519 (1990); *Dunn v. State*, 721 S.W.2d 325, 341 (Tex.Cr.App.1986); *Walker v. State*, 470 S.W.2d 669, 671 (Tex.Cr.App.1971); *McCain v. State*, 139 Tex.Crim. 539, 141 S.W.2d 613, 614 (1940); *and, Guinn v. State*, 39 Tex. Crim. 257, 45 S.W. 694 (1898). A confession resulting from a person's statement that it can be used "for or against" the defendant is inadmissible as a matter of law because it constitutes an improper inducement and because it does not comply with the statutory warnings in art. 38.22. *Dunn*, 721 S.W.2d at 341. However, where there is a factual discrepancy as to whether such a representation was made, the trial judge is responsible for determining whether the confession is admissible. *Long v. State*, 823 S.W.2d 259, 277 (Tex.Cr.App.1991); *Moore v. State*, 700 S.W.2d 193, 202 (Tex.Cr.App.1985); *and, Freeman v. State*, 618 S.W.2d 52, 53 (Tex.Cr. App.1981). And that decision will not be disturbed absent an abuse of discretion. *Long*, 823 S.W.2d at 277; *Johnson v. State*, 803 S.W.2d 272, 287 (Tex.Cr.App.1990); *and, Sosa v. State*, 769 S.W.2d 909, 915 (Tex.Cr. App.1989).

The record contains evidence that Sheffield informed appellant that his written confession could be used "for or against" him. During the *Jackson v. Denno* hearing,[13] Sheffield made several statements indicating he might have used the phrase "for or against":

> [Appellant]: You didn't tell [appellant] [the confession] might help him?

> [Sheffield]: No sir.

> Q: Did you tell him it could be used for or against him?

> A: Yes, sir.

* * *

Later, on re-direct examination:

> [The State]: Do you specifically remember, Detective, telling [appellant], you telling [appellant] that a statement could be used for him or that a statement could be used for or against him?

> A: I don't recall. I usually say for or against, but I don't recall exactly, but I probably said for or against.

However, the record also contains evidence which contradicts Sheffield's testimony. During the hearing Hobbs denied Sheffield informed appellant his confession could be used "for or against" him. Hobbs testified that he, *not* Sheffield, admonished appellant prior to taking his confession:

> [Appellant]: And did you also—you think he understood? His understanding was that if he gave a statement, it could be used for or against him at the time of trial?

> A: I told him it could and would be used against him.

> Q: Did anybody to your knowledge tell him that it could be used for or against him?

> A: I read the warnings verbatim. I asked if they understood them.

> Q: But you don't know if somebody else told him it could be used for or against him. Isn't that right?

> A: On the date of the confession, I don't believe Mr. Dinkins was ever out of my presence.

> Q: So if somebody else told him that, you just wouldn't be aware of it. Is that right?

> A: Just didn't happen, not on the 14th.

> Q: Unless somebody told him that and you didn't hear it. Is that correct?

**13.** *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

A: Yes, sir, I suppose.

Q: Did Detective Sheffield give him warnings on the 14th?

A: I believe I gave him his warnings.

Q: So if Detective Sheffield said that he warned him and told him that statement could be used for or against him, you just didn't hear that conversation. Is that correct?

A: There were many times when we were talking together, but I believe I read him the warnings.

Q: So if Detective Sheffield told him that this statement could be used for or against him, you just didn't hear the conversation. Is that right?

A: Well ... if I read him his warnings and then—Detective Sheffield and I may have asked him if he understood them, do I remember those words verbatim? No, sir, I don't.

Q: Okay.

A: But could that have been said, I suppose so in an effort to explain his rights.

The trial judge overruled appellant's motion to suppress the confession and filed findings of fact and conclusions of law in which he specifically found appellant's confession was not induced by any advice that the confession could be used "for or against" him.

■ Evidence that a defendant received an improper warning need not be wholly rebutted, but merely contradicted in order that a confession be admissible. *Muniz v. State*, 851 S.W.2d 238, 252 (Tex.Cr.App.1993); *Moore*, 700 S.W.2d at 202; *and, Barton v. State*, 605 S.W.2d 605, 607 (Tex.Cr.App.1980) (defendant's claim his confession resulted from beating was contradicted by testimony police used force to break up jail altercation between defendant and another.). In *Sterling*, and *Dunn*, we held the confessions were inadmissible because the interrogating officers testified, without contradiction, that the defendants were advised their confessions could be used "for or against" them. *Sterling*, 800 S.W.2d at 518–519; *and, Dunn*, 721 S.W.2d at 340–342.

By contrast, in *Freeman*, 618 S.W.2d 52, *and Coursey v. State*, 457 S.W.2d 565 (Tex. Cr.App.1970), we held the confessions admissible because the testimony was contradicted. In *Freeman*, the interrogating officer testified he informed the defendant his statement could be used "for or against" him. *Id.*, 618 S.W.2d at 53. However, he later denied he had used the phrase "for or against" when warning the defendant and attributed his prior testimony to his misunderstanding of defense counsel's questions. He further testified he warned the defendant from the standard warning form, which tracked the language of art. 38.22. *Id.* In holding the confession was admissible, we explained the trial judge has the discretion to resolve factual discrepancies in the testimony. *Id.*

In *Coursey*, the defendant contended the County Attorney advised him that his confession could be used either for or against him. A police officer present at the interrogation testified at trial that the County Attorney advised the defendant that his confession could be used for or against him. *Id.*, 457 S.W.2d at 567. However, the officer subsequently testified the warnings were read off the standard warning form, which conformed to the statutory warnings in effect at the time. *Id.* Further, the County Attorney denied advising the defendant his statement could be used for or against him. *Id.*, at 568. We held the County Attorney's and the officer's testimony sufficiently controverted the defendant's claims and, therefore, the confession was admissible. *Id.*

■ Although Sheffield's testimony permits the conclusion that he informed appellant his confession could be used "for or against" him, his testimony was contradicted. *Sterling* and *Dunn* are not controlling because Sheffield's testimony is not an unqualified admission he said "for or against." More significantly, Sheffield's testimony is contradicted by Hobbs, who testified that he, not Sheffield, warned appellant the day his confession was taken. To believe the testimony of one is to disbelieve the testimony of the other. Accordingly, it was within the trial judge's discretion to resolve this factual discrepancy, *Freeman*, 618 S.W.2d at 53, and, in light of the record, we cannot conclude

that he abused his discretion. **Appellant's twelfth point of error is overruled.**

## IX.

In his thirteenth and fourteenth points of error, appellant argues his confession and other evidence were admitted in violation of his right to counsel under the Fifth Amendment of the United States Constitution.[14] Appellant contends he invoked his right to counsel prior to giving his confession and, therefore, the confession and all the evidence obtained because of it were inadmissible.

Sheffield and Hobbs first contacted appellant at his place of work on September 13th, the day after the offense. After advising appellant of his *Miranda* rights,[15] the detectives questioned him and sought permission to search his car. Appellant spoke with the detectives but refused to consent to a search. At some point in the conversation appellant stated "maybe I should talk to someone," at which time the detectives ceased their questions and arrested appellant on an outstanding misdemeanor arrest warrant. Later that day, appellant telephoned his grandmother and asked to speak to the police detective, Detective Clifton Orr, who was there investigating appellant's alibi for the previous night. Appellant denied he committed the murders but stated he would allow the police to search his car. Orr then telephoned Sheffield and informed him appellant would sign a written consent to search the car. A search of the car recovered a .357 revolver, two boxes of ammunition and items of clothing.

Appellant was again interrogated by Hobbs and Sheffield the next morning, September 14. After reading appellant his *Miranda* rights, the detectives sought appellant's written consent to search various locations, including his home and his locker at work. At some point during the interrogation appellant asked Sheffield "what a lawyer would tell him to do?" Sheffield informed him "in no uncertain terms that a lawyer would tell him to keep his mouth shut and not to talk to the police at all." Appellant signed a written consent to search form and accompanied Hobbs and Sheffield as they conducted the searches. The record does not support a showing appellant requested an attorney while accompanying the detectives during their searches. Moreover, the record is clear that appellant met with both his brother and his grandmother during the day but did not request either of them to retain an attorney. Upon returning to the District Attorney's office, the detectives again interrogated appellant. During the interrogation, appellant asked to speak to his mother in Atlanta, Georgia. According to Hobbs, who was waiting in the doorway during the conversation, appellant did not ask his mother to retain counsel for him. After the conversation, the detectives informed appellant capital murder charges would be filed against him. Appellant then agreed to dictate a statement. Hobbs read appellant his *Miranda* warnings and had appellant read back the warnings and sign them. Appellant then dictated his statement. After being formally charged with capital murder and returned to the county jail, appellant requested to talk to a local attorney whose name was given to him by his mother. Although Hobbs did not know the attorney whom appellant requested, he looked up the telephone number of an attorney having a similar name and arranged to have appellant use the telephone.

Under the Fifth Amendment to the United States Constitution, in order to effectuate the right against self-incrimination, once a suspect has invoked his right to counsel, all interrogation by the police must cease until counsel is provided or until the suspect himself re-initiates conversation. *Minnick v. Mississippi*, 498 U.S. 146, 153, 111 S.Ct. 486, 491, 112 L.Ed.2d 489 (1990); *Edwards v. Arizona*, 451 U.S. 477, 484–485, 101 S.Ct. 1880, 1884–1885, 68 L.Ed.2d 378

---

**14.** In his thirteenth point of error, appellant also raises a state constitutional claim under art. I, § 10 of the Texas Constitution. However, because appellant has provided no argument or authority regarding the protection afforded by art. I, § 10, we consider the State constitutional claim inadequately briefed and decline to address it. *See, Robinson v. State*, 851 S.W.2d 216,

222, n. 4 (Tex.Cr.App.1991) (citing *McCambridge v. State*, 712 S.W.2d 499, 501–502 (Tex.Cr.App. 1986); *and*, Tex.R.App.P. 74(f)).

**15.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

(1980); *Miranda v. Arizona,* 384 U.S. 436, 474, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966); *Hicks v. State,* 860 S.W.2d 419, 429–430 (Tex.Cr.App.1933); *and, Upton v. State,* 853 S.W.2d 548, 552 (Tex.Cr.App.1993). "The right to counsel is considered invoked where a person indicates he or she desires to speak to an attorney or have an attorney present during questioning." *Lucas v. State,* 791 S.W.2d 35, 45 (Tex.Cr.App.1989). An invocation must be clear and unambiguous; the mere mention of the word "attorney" or "lawyer" without more, does not automatically invoke the right to counsel. *Robinson v. State,* 851 S.W.2d 216, 223 (Tex.Cr.App.1991); *Collins v. State,* 727 S.W.2d 565, 568 (Tex.Cr.App.1987) *and, Russell v. State,* 727 S.W.2d 573, 575 (Tex.Cr.App.1987). When reviewing alleged invocations of the right to counsel, we typically look at the totality of the circumstances surrounding the interrogation, as well as the alleged invocation, in order to determine whether a suspect's statement can be construed as an actual invocation of his right to counsel. *Lucas,* 791 S.W.2d at 45–46, *and, Russell,* 727 S.W.2d at 576. Because appellant made no explicit requests for an attorney, we must review the record to determine whether any of appellant's statements can be clearly understood to be an invocation of his right to counsel. Foremost is appellant's statement on September 13 while being questioned by Detectives Sheffield and Hobbs, "Maybe I should talk to someone."

The United States Supreme Court addressed the issue of ambiguous invocations of the right to counsel in *Davis v. United States,* — U.S. —, —, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994). Davis, a member of the United States Navy, was questioned by naval police following the beating death of the deceased, who owed Davis money. After being advised of his *Miranda* rights, Davis waived his right to remain silent and his right to counsel, orally and in writing. *Id.,* — U.S. at —, 114 S.Ct. at 2353. About an hour and a half into the interrogation, Davis stated "Maybe I should talk to a lawyer" at which point the interrogators stopped and attempted to clarify whether Davis was actually invoking his right to an attorney. Davis, however, denied he wanted an attorney and the interrogation continued for another hour until Davis stated "I think I want a lawyer before I say anything else." At this point, the interrogation ceased. *Id.* At his court-martial, Davis was convicted of murder after unsuccessfully attempting to suppress his statement. The United States Court of Military Appeals affirmed and the Supreme Court granted certiorari to determine whether Davis's initial statement constituted an actual invocation of his right to counsel. *Id.,* — U.S. at —, 114 S.Ct. at 2354.

The Court explained that unlike the right to counsel under the Sixth Amendment which attaches automatically, the right to counsel under *Miranda* is a prophylactic measure and is not inherent within the Fifth Amendment. *Davis,* — U.S. at —, 114 S.Ct. at 2354–2355. The prohibition against continued questioning following an invocation of the right to counsel is "justified only by reference to its prophylactic purpose," *Id.,* — U.S. at —, 114 S.Ct. at 2355 (quoting *Connecticut v. Barrett,* 479 U.S. 523, 528, 107 S.Ct. 828, 832, 93 L.Ed.2d 920 (1987)), that is to say, to protect a suspect *who has already invoked his right to silence* from being badgered into self-incrimination by continued questioning by the police. Accordingly, a court's focus is on whether a suspect *actually* invokes his right, *Id.,* — U.S. at —, 114 S.Ct. at 2355 (citing *Smith v. Illinois,* 469 U.S. 91, 95, 105 S.Ct. 490, 492, 83 L.Ed.2d 488 (1984)), and the inquiry is purely · an objective one:

> … Invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." … But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning….

Rather, the suspect must unambiguously request counsel. As we have observed, "a statement either is such an assertion or it is not." … Although a suspect need not

"speak with the discrimination of an Oxford don" ... he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards [v. Arizona,* supra] does not require that the officers stop questioning the suspect.

*Davis,* —— U.S. at ——, 114 S.Ct. at 2355 (citations omitted) (emphasis in original).

Turning its attention to the facts of the case, the Court held Davis' statement, "Maybe I should talk to a lawyer" was too equivocal to constitute an invocation of the right to counsel. *Id.,* —— U.S. at ——, 114 S.Ct. at 2357. Therefore, the police were not required to cease their questioning. *Cf., Jones v. State,* 742 S.W.2d 398, 405 (Tex.Cr. App.1987) (Defendant's statement "I think I want a lawyer" was a clear and unequivocal assertion of her right to counsel.).

■■■ Appellant's statement in the instant case is more ambiguous than the statement in *Davis.* In response to questioning by Sheffield and Hobbs, appellant merely stated, "Maybe I should talk to *someone* " but failed to specify to whom he wished to speak. *Davis* makes it clear that police are not required to ask clarifying questions when a suspect makes an equivocal invocation of counsel. *Id.,* —— U.S. at ——, 114 S.Ct. at 2356. We additionally note the detectives ceased questioning appellant and only resumed questioning him after appellant reinitiated contact with Detective Orr later that day. We therefore hold appellant's statement was not a clear and unequivocal invocation of the right to counsel. While there "are no magical words required to invoke an accused's right to counsel," *Russell,* 727 S.W.2d at 576, we believe that *Davis,* requires, at a minimum, that a suspect express a definite desire to speak to someone, and that person be an attorney. *See, Id.,* —— U.S. at ——, 114 S.Ct. at 2355.

We find no further indication in the record that appellant clearly invoked his right to an attorney prior to giving his confession. Appellant's question to Detective Sheffield concerning what an attorney would tell him to do under the circumstances does not rise to an invocation of the right to counsel. *See, Russell,* 727 S.W.2d at 576 (Defendant's question to officers "whether they thought the presence of an attorney was necessary" did not invoke right to counsel). Instead, the only time appellant clearly requested to speak with counsel was *after* he had given his confession, been formally charged of the offense by a magistrate, and returned to jail. Appellant's reliance on *Green v. State,* 667 S.W.2d 528 (Tex.Cr.App.1984), *and, Porier v. State,* 662 S.W.2d 602 (Tex.Cr.App.1984), is misplaced because those cases are factually distinguishable. Consequently, we hold appellant did not invoke his right to counsel prior to giving his confession. **Appellant's thirteenth and fourteenth points of error are overruled.**

## X.

In his fifteenth point of error, appellant contends the trial judge erred in refusing to instruct the jury on a factual issue raised at trial. Appellant timely requested instructions which instructed the jury to disregard appellant's confession if they determined Sheffield advised appellant his confession could be used in his favor, or if they determined appellant requested counsel prior to making his confession. The trial judge denied appellant's request and submitted the following general instructions to the jury:

You are instructed that if you believe from the evidence, or it you have a reasonable doubt thereof, that the alleged statements of the defendant were not voluntarily made, you will not consider the statements or any evidence obtained as a result of the statements for any purpose whatsoever.

You are instructed that unless you believe from the evidence beyond a reasonable doubt that State's Exhibit # 42 [appellant's confession] introduced into evidence was freely and voluntarily made without compulsion or persuasion, or if you have a reasonable doubt thereof, you shall not consider State's Exhibit # 42 for any purpose nor any evidence obtained as a result thereof.

Now, if you find from the evidence or if you have a reasonable doubt thereof, that Officer Sheffield told defendant before he signed State's Exhibit # 42, if any, that it could be used for him, and that such statement by Officer Sheffield was an inducement to defendant such as to render State's Exhibit # 42 not wholly voluntary, then such statement shall not be freely and voluntarily made, and in such case you are wholly to disregard State's Exhibit # 42 and not consider it for any purpose nor any evidence obtained as a result of State's Exhibit # 42.

The trial judge's instructions to the jury did not address whether appellant had invoked his right to counsel prior to making his confession. Appellant maintains the submitted jury instruction, failed to apply the law to the specific facts of the case.

■ When the evidence presented at trial raises a factual dispute over whether a defendant's written statement was voluntary, he is entitled to an instruction in the jury charge advising the jury generally on the law pertaining to such statement. *Muniz v. State,* 851 S.W.2d 238, 254 (Tex.Cr.App.1993); *Miniel v. State,* 831 S.W.2d 310, 316 (Tex.Cr. App.1992); *Hernandez v. State,* 819 S.W.2d 806, 812 (Tex.Cr.App.1991); *Thomas v. State,* 723 S.W.2d 696 (Tex.Cr.App.1986); *and,* art. 38.22, § 7. The issue of voluntariness arises when any evidence suggests the statement was not given in conformity with art. 38.22, § 2. *Hernandez,* 819 S.W.2d at 812 (citing *Brooks v. State,* 567 S.W.2d 2, 3 (Tex.Cr.App. 1978)).

■ The State claims that no factual issue of voluntariness was raised before the jury. We disagree. Detective Sheffield made several equivocal statements at trial which suggest he could have informed appellant his confession could be used for or against him. This testimony was contradicted by Detective Hobbs. Because this testimony raises a factual dispute, and since resolution of this factual dispute has repercussions upon the voluntariness of the statement, *see, Sterling,* 800 S.W.2d at 518–519, appellant was clearly entitled to a jury instruction on voluntariness. *Muniz,* 851 S.W.2d at 254. The question remains whether appellant was entitled to the instruction he requested.

■ In those cases where we have reviewed the sufficiency of the jury instructions, we have consistently held that when the issue of voluntariness is raised, a defendant is only entitled to *general* instruction on voluntariness. *See, White v. State,* 779 S.W.2d 809, 827 (Tex.Cr.App.1989). *See also, Burdine v. State,* 719 S.W.2d 309, 319–320 (Tex.Cr.App.1986); *Hawkins v. State,* 660 S.W.2d 65, 77 (Tex.Cr.App.1983) (plurality op.); *and, Moon v. State,* 607 S.W.2d 569 (Tex.Cr.App.1980) (panel op.). In *Moon,* for example, the defendant contended the jury charge was fundamentally defective for failing to include the issue of whether the police threatened him into making a confession. We nonetheless upheld the instruction as given, stating: "The trial court charged the jury, in essence, that they could consider the confession only if 'it appears that the same was freely made without compulsion or persuasion.' This charge was adequate to protect appellant's rights." *Id.,* at 570. *See also, Hawkins v. State,* 660 S.W.2d at 77.

Notably, in *Burdine,* we upheld an instruction similar to the one presently before us. The defendant contended the instruction on voluntariness was defective because it did not address whether his statement was induced by a promise. *Id.,* 719 S.W.2d at 320. The trial judge instructed the jury:

> You are instructed that under our law a confession of a defendant made while the defendant was in jail or in custody of an officer and while under interrogation shall be admissible in evidence if it appears that the same was freely and voluntarily made without compulsion or persuasion....

*Id.*

We also observed

> ... the jury was [additionally] instructed that they could not consider the appellant's confession for any purpose, unless they found that the appellant had been warned of his rights and voluntarily waived his rights prior to making a statement.

*Id.* Noting that the defendant failed to show how the instructions were erroneous, we held

the jury was properly charged on the issue of voluntariness. *Id.*

▆ The jury instructions in the instant case are similar to those in *Burdine.* The jury was instructed that if they believed Sheffield advised appellant his confession could be used for him, it would constitute an improper inducement and the confession would not be voluntary. We hold that this is a sufficient instruction under art. 38.22, § 7 and art. 38.23. *See, Burdine,* 719 S.W.2d at 320.

▆ We now turn to appellant's contention that the trial judge erred in failing to include an instruction regarding appellant's invocation of the right to counsel.[16] A defendant is entitled to a jury instruction only where there is a factual dispute before the jury. *Thomas,* 723 S.W.2d at 707. However, whether a defendant's statements to the police constitute an invocation of the right to counsel is a matter of law which must be determined by the trial judge. *See, Davis, supra.* We have already determined that appellant's statement, "[m]aybe I should talk to someone," did not invoke his right to counsel because, as a matter of law, it was too ambiguous. We have further determined that appellant's question to Detective Sheffield concerning what an attorney would advise him similarly failed to invoke appellant's right to counsel. Detectives Sheffield and Hobbs testified at trial that appellant did not request counsel prior to making his confession and appellant has failed to point to any part of the record which contradicts that testimony. Consequently, because there was no *factual* dispute before the jury over whether appellant invoked his right to counsel prior to making his confession, he was not entitled to a jury instruction on that issue. *See, Hernandez,* 819 S.W.2d at 812 ("If evidence offered before the jury does not raise the issue of voluntariness of the confession, appellant is not entitled to a jury charge on the matter."). **Appellant's fifteenth point of error is overruled.**

**16.** We pause to note that we have substantially addressed this issue in Part IX, *supra.*

## XI.

In his sixteenth and seventeenth points of error, appellant complains that on two separate instances, a police officer was allowed to offer impermissible speculation while testifying. During examination of Sgt. Tatum at punishment phase, the following testimony ensued:

[The State]: And in your opinion, Mrs. Thompson's head could have been no higher than 31 inches above the floor?

[Witness]: Yes, Sir.

Q: Now when you first saw State's Exhibit 45, the door over here, was there a bullet in the doorknob?

A: Yes, sir.

Q: And is it your—is your opinion that was fired after Katherine Thompson was shot twice?

A: Yes, sir.

Q: *Did you draw a conclusion as to why that shot was fired?*

A: *I think he was trying to get the door open to get to Ms. Cutler.*

Q: Okay. Now when you arrived at the scene—

[Appellant]: *I'll object to that testimony, it's pure speculation.*

[The Court]: Overruled.

A short while later, the following ensued:

[The State]: Based on your information from the scene there, were you able to determine, in your opinion, first of all, where Shelly Cutler was when she was shot?

[The Witness]: She was about in the position where you have the X and it appeared she was on her knees down on the floor.

Q: Okay. Would you characterize it as crouching down?

A: Yes, sir.

Q: And would you believe that she had her head down?

A: Yes, sir.

Q: Now with Shelly Cutler in this position, would it have been possible for someone to reach through that broken

window and fire a gun directly into the top of her head?

A: Yes, sir.

Q: *Is that what you believe occurred?*

A: *Exactly.*

[Appellant]: *I'll object to that also, Your Honor, as speculation on the part of Officer Tatum.*

[The Court]: Overruled.

■ A defendant must make a timely objection in order to preserve an error in the admission of evidence. *Johnson v. State*, 878 S.W.2d 164, 167 (Tex.Cr.App.1994); *Ethington v. State*, 819 S.W.2d 854, 858 (Tex.Cr. App.1991); *Sattiewhite v. State*, 786 S.W.2d 271, 283 (Tex.Cr.App.1989); *and*, Tex. R.App.P. 52(a). An objection should be made as soon as the ground for objection becomes apparent. *Johnson v. State*, 803 S.W.2d 272, 291 (Tex.Cr.App.1991); *and*, *Thompson v. State*, 691 S.W.2d 627, 635 (Tex. Cr.App.1984). In general, this occurs when the evidence is admitted. *Wilson v. State*, 511 S.W.2d 531, 532 (Tex.Cr.App.1974). *But see, Johnson, supra.* Therefore, if a question clearly calls for an objectionable response, a defendant should make an objection before the witness responds. *Webb v. State*, 480 S.W.2d 398, 400 (Tex.Cr.App.1972). If he fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely and error is waived. *See, Girndt v. State*, 623 S.W.2d 930, 934 (Tex.Cr.App.1981); *Guzman v. State*, 521 S.W.2d 267, 269 (Tex.Cr.App.1975) (Error was waived because defendant failed to object until three objectionable questions were asked and answered.); *Sikes v. State*, 500 S.W.2d 650, 651 (Tex.Cr.App.1973) (Where defendant failed to object to Judge's question constituting a comment on the evidence until after question was asked and answered, error was waived.); *Webb*, 480 S.W.2d at 400; *and, Crestfield v. State*, 471 S.W.2d 50, 54 (Tex.Cr.App.1971) (Where witness had already completed answer before defendant objected the witness was testifying outside area of expertise, error was waived.).

■ In the instant case, the State's questions clearly called for a speculative answer. The ground for objection was apparent when the question was asked. However, appellant offered no explanation for failing to object before the witness answered. We hold, therefore, that appellant's failure to make a timely objection waived error for review. **Appellant's sixteenth and seventeenth points of error are overruled.**

## XII.

In points of error number eighteen and nineteen, appellant contends a State's witness impermissibly commented on appellant's post-arrest silence. The State examined Hobbs during the punishment phase of the trial regarding appellant's demeanor while accompanying the detectives. At one point, the prosecutor asked whether appellant had shown remorse for his crime while in police custody and Hobbs answered he had not. Appellant objected that Hobbs' testimony constituted a comment on appellant's right to remain silent. The trial judge sustained appellant's objection and instructed the jury to disregard it.

Moments later, Hobbs made the following comments during cross-examination:

[Appellant]: And from your testimony I gather that he appeared to be in somewhat a different state of mind than what you would expect from somebody who was under investigation for capital murder?

[Hobbs]: Certainly the way he displayed his emotions was different than any I had experienced.

Q: Okay. And it's your testimony that he never asked you a single question?

A: No. That's not—he never—he would pose questions, for example like the one we previously talked about regarding whether or not the giving of a statement would affect the level of charges, what an attorney would tell him, but as far as the questioning, regarding—when we were questioning him about his whereabouts, his comings and goings the evening of the offense, such as that, its been my experience that most times when you're questioning someone, they will

protest their innocence, they will, you know, suggest things that would clear their—clear themselves. He did very little of that.

[Appellant]: I'll object to that as being non-responsive, Your Honor.

[The Court]: Overruled.

[Appellant]: And I would also object on the basis that it's a comment on the defendant's election not to testify.

[The Court]: Overruled.

A comment on a defendant's post-arrest silence violates the Fifth Amendment prohibition against self-incrimination. *Doyle v. Ohio,* 426 U.S. 610, 617–618, 96 S.Ct. 2240, 2244–2245, 49 L.Ed.2d 91 (1976); *and, Miranda v. Arizona,* 384 U.S. 436, 468, n. 37, 86 S.Ct. 1602, 1625, n. 37, 16 L.Ed.2d 694 (1966). *See also, Sanchez v. State,* 707 S.W.2d 575, 579–580 (Tex.Cr.App.1986); *Sutherlin v. State,* 682 S.W.2d 546, 548 (Tex. Cr.App.1984); *and, Cuellar v. State,* 613 S.W.2d 494, 495 (Tex.Cr.App.1981). A comment on a defendant's post-arrest silence is akin to a comment on his failure to testify at trial because it attempts to raise an inference of guilt arising from the invocation of a constitutional right. Moreover, the prohibition against commenting on post-arrest silence includes testimony regarding a defendant's contrition or remorse because such testimony can only come from the defendant. *Swallow v. State,* 829 S.W.2d 223, 225 (Tex.Cr.App. 1992) (citing *Thomas v. State,* 638 S.W.2d 481, 484 and n. 8 (Tex.Cr.App.1982)).

With regard to Hobbs' testimony regarding appellant's apparent lack of remorse, we agree with appellant that this testimony constituted a comment on appellant's post-arrest silence, and was therefore inadmissible. However, this does not lead to an automatic reversal. As we explained in *Waldo v. State,* 746 S.W.2d 750 (Tex.Cr.App. 1988):

... the ... presumption that an instruction [to disregard] generally will *not* cure comment on failure of the accused to testify ... has been eroded to the point that it applies only to the most blatant examples. Otherwise, the Court has tended to find the instruction to have force.... Even where we have found such comment beyond cure, the Court has nevertheless held it can constitute harmless error in context of the particular case.

*Id.,* at 753. *See also, Jones v. State,* 693 S.W.2d 406, 408–409 (Tex.Cr.App.1985). In the instant case, the trial judge sustained appellant's objection and instructed the jury to disregard Hobbs' testimony. Therefore, we find the error was cured. **Appellant's eighteenth point of error is overruled.**

Hobbs' testimony regarding appellant's failure to protest his innocence was also an impermissible comment on appellant's post-arrest silence. However, because the trial judge overruled appellant's objection and failed to instruct the jury to disregard the statement, the error was not cured. Therefore, we must conduct a harm analysis to determine whether Hobbs' testimony contributed to appellant's punishment. Tex. R.App.P. 81(b)(2).

When reviewing the record for harm, we examine a number of factors: the source and nature of the error, the extent to which it was emphasized by the State, the weight a juror would probably place upon the error, and whether finding the error harmless would encourage the State to repeat it with impunity. *Harris v. State,* 790 S.W.2d 568, 587 (Tex.Cr.App.1989).

We initially note the comment was *not* elicited by the State, but was in response to a question by appellant. We additionally note the State made no attempt during closing argument to emphasize appellant's failure to protest his innocence. Therefore, bad faith by the State is not a consideration here. Further, we do not believe the testimony influenced the jury's deliberation. In contrast to testimony regarding appellant's apparent lack of remorse, Hobbs' testimony regarding appellant's failure to protest his innocence alluded to his culpability for the offense, rather than his contrition for it. The testimony did not augment the evidence at punishment relevant to the issues to be determined by the jury at punishment: deliberation, future dangerousness, and provocation. Thus, it is unlikely the jury would have placed any weight in the testimony. Finally,

finding the error harmless will not encourage repetition by the State because appellant elicited the testimony. Therefore, we conclude beyond a reasonable doubt that the comment did not contribute towards appellant's punishment. **Point of error nineteen is overruled.**

## XIII.

Appellant contends in his twentieth point of error that error occurred during closing argument when the prosecutor made comments which amounted to striking at appellant over the shoulders of defense counsel. The prosecutor made the following comment during the State's closing argument in the guilt/innocence phase:

[The State]: The case starts coming together, and we know without State's Exhibit 42—Folks this is as voluntary as it can be. There's not any question about that. Now, [Defense Counsel] wants to mislead you a little bit by saying if you find—

The trial judge sustained appellant's objection and instructed the jury to disregard the statement, but denied appellant's motion for a mistrial. Appellant now contends the comment constituted reversible error.

 Permissible jury argument is limited to four areas: 1) summation of the evidence; 2) reasonable deductions from the evidence; 3) responses to opposing counsel's argument; and, 4) pleas for law enforcement. *Coble v. State*, 871 S.W.2d 192, 204 (Tex.Cr. App.1993); *Felder v. State*, 848 S.W.2d 85, 94–95 (Tex.Cr.App.1992); *and, Todd v. State*, 598 S.W.2d 286, 296–297 (Tex.Cr.App.1980). Generally, when an argument falls outside of these areas, error occurs. However, an instruction to disregard the argument generally cures the error. *McGee v. State*, 774 S.W.2d 229, 238 (Tex.Cr.App.1989); *and, Anderson v. State*, 633 S.W.2d 851, 855 (Tex. Cr.App.1982).

 We have consistently held that argument which strikes at a defendant over the shoulders of defense counsel is improper, *Coble*, 871 S.W.2d at 205; *and, Fuentes v. State*, 664 S.W.2d 333, 335 (Tex.Cr.App.1984), and, prior to the enactment of Rule 81(b)(2),

such comments amounted to automatic reversible error, despite an instruction to disregard. *Gomez v. State*, 704 S.W.2d 770 (Tex. Cr.App.1985); *Bell v. State*, 614 S.W.2d 122 (Tex.Cr.App.1981); *and, Lopez v. State*, 500 S.W.2d 844 (1973). However, in *Orona v. State*, 791 S.W.2d 125, 128 (Tex.Cr.App.1990), we held such improper comments will be analyzed under the framework of Rule 81(b)(2). *Id.*, 791 S.W.2d at 129–130.

 We disagree with the State that the prosecutor's comment was permissible as rebuttal to defense counsel's prior argument concerning the voluntariness of appellant's confession. Although the prosecutor's statements may have been intended as a rebuttal, they also cast aspersion on defense counsel's veracity with the jury. *Compare, Lopez*, 500 S.W.2d at 846 (reversible error occurred at comment that defense counsel and defendants were liars when pled not guilty). *But see, Gorman v. State*, 480 S.W.2d 188, 190 (Tex.Cr.App.1972) (comment "don't let [defense counsel] smoke-screen you" was permissible rebuttal). Nonetheless, the prosecutor's comment was not as egregious as those in *Gomez, supra*, (reversible error resulted from comment that defense counsel was paid to "manufacture evidence" and "get this defendant off the hook"); *and, Bray v. State*, 478 S.W.2d 89, 89–90 (Tex.Cr.App. 1972) (reversible error resulted from comment that prosecutor was grateful for not having to represent someone like defendant). Moreover, the trial judge sustained appellant's objection and instructed the jury to disregard the statement. Finally the State made no further comments impugning defense counsel's veracity. We therefore hold the error was harmless. **Appellant's twentieth point of error is overruled.**

## XIV.

 In his twenty-first point of error, appellant challenges the sufficiency of the evidence to support an affirmative answer to the second punishment issue. When conducting a review of the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have affirmatively answered the pun-

ishment issue beyond a reasonable doubt. *Barnes v. State,* 876 S.W.2d 316, 322 (Tex.Cr. App.1994); *and, Valdez v. State,* 776 S.W.2d 162, 166 (Tex.Cr.App.1989). In *Keeton v. State,* 724 S.W.2d 58, 61 (Tex.Cr.App.1987), we listed several factors which we consider when evaluating the sufficiency of the evidence to support an affirmative answer to the second punishment issue. These factors include:

(1) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or in concert with other parties;

(2) the calculated nature of the defendant's actions;

(3) the forethought and deliberateness exhibited by the crime's execution;

(4) the existence of a prior criminal record and the severity of the prior offenses;

(5) the defendant's age and personal circumstances at the time of the commission of the offense;

(6) whether the defendant was acting under duress or intoxication or under the domination of another at the time of the commission of the offense;

(7) the lack of psychiatric evidence concerning future dangerousness; and,

(8) any relevant character evidence.

*Id. See also, Wilkerson v. State,* 881 S.W.2d 321, 335–336 (Tex.Cr.App.1994) (Baird, J., dissenting); *Rousseau v. State,* 855 S.W.2d 666, 684–685 and n. 25 (Tex.Cr.App.1993); *Bogges v. State,* 855 S.W.2d 656, 661–663 (Tex.Cr.App.1989); *Johnson v. State,* 853 S.W.2d 527, 532 (Tex.Cr.App.1992); *and, Valdez v. State,* 776 S.W.2d 162, 166–167 (Tex.Cr.App.1989). No one factor is dispositive, and the jury's affirmative answer to the second punishment issue may withstand a sufficiency challenge notwithstanding the lack of evidence relating to one or more of these factors. *Vuong v. State,* 830 S.W.2d 929, 935 (Tex.Cr.App.1992).

In order to determine whether the evidence is sufficient to support an affirmative answer to the second punishment issue, we should examine those cases in which we have found the evidence is insufficient. *Keeton,* 724 S.W.2d at 61; *and, Wilkerson,* 881

S.W.2d at 336 (Baird, J., dissenting). However, we pause to note that each case must be resolved on its own facts. *Vuong,* 830 S.W.2d at 935 (citing *Santana v. State,* 714 S.W.2d 1, 8 (Tex.Cr.App.1986)). We will therefore review the facts of the instant case in light of the aforementioned factors and the relevant decisional authority.

**1. Circumstances of the Offense**

 Tex.Penal Code Ann. § 19.03 "limits the circumstances under which the State may seek the death penalty to a small group of narrowly defined *and particularly brutal offenses.*" *Smith v. State,* 779 S.W.2d 417, 420 (Tex.Cr.App.1989) (quoting *Jurek v. State,* 522 S.W.2d 934, 939 (Tex.Cr.App.1975) (emphasis added)). While the commission of a capital offense is undeniably brutal the mere fact that such an offense is committed is insufficient in itself to prove future dangerousness. *See, Green v. State,* 682 S.W.2d 271, 289 (Tex.Cr.App.1984), *cert. den.,* 470 U.S. 1034, 105 S.Ct. 1407, 84 L.Ed.2d 794 (1985); *and, McMahon v. State,* 582 S.W.2d 786, 792 (Tex.Cr.App.1978). Although the circumstances of the offense alone may be sufficient to sustain the jury's affirmative answer to the second punishment issue, *Allridge v. State,* 850 S.W.2d 471, 488 (Tex.Cr. App.1991); *and, Black v. State,* 816 S.W.2d 350, 355 (Tex.Cr.App.1991), we have typically required those circumstances to be so heinous as to display a "wanton and callous disregard for human life." *Deeb v. State,* 815 S.W.2d 692, 703 (Tex.Cr.App.1991); *and, O'Bryan v. State,* 591 S.W.2d 464, 481 (Tex. Cr.App.1979). For example, in *Joiner v. State,* 825 S.W.2d 701, 704 (Tex.Cr.App.1992), we found the evidence sufficient to support an affirmative answer to the second punishment issue where the defendant murdered two women. A medical examiner testified that "[t]he first complainant, was found to have been stabbed four times in the chest and ... received a series of lacerations on her neck. The second complainant suffered forty-one stab wounds to her chest, blunt force trauma to her head, lacerations to the head, and her throat had been ... 'slashed.'" Physical evidence further suggested that each complainant was sexually assaulted by appellant after their deaths. *Id.,* at 704. In

finding the evidence sufficient to support the sentence, we stated:

> The evidence presented in this case demonstrates a complete disregard for the sanctity for human life. Appellant not only took the lives of the two complainants herein but disfigured and brutalized their bodies. Appellant's actions appear cold, deliberate and calculated.

*Id.*, at 704.

Similarly, in *Vuong*, 830 S.W.2d at 935, we found the circumstances of the offense alone were sufficient to support the jury's affirmative answer where the defendant systematically shot the patrons in a game room with a semi-automatic rifle, killing two and injuring seven.

By contrast, in *Smith*, 779 S.W.2d 417, the defendant committed murder in the course of a sexual assault. After gaining entry to the deceased's apartment, the defendant tied the deceased to the headboard of her bed and sexually assaulted her. *Id.*, at 419. He then untied her and stabbed her fourteen times in the chest and back, including once through the heart. In a written confession, the defendant explained: "After I raped her, I decided to kill her and kind of went crazy for a few minutes." *Id.* At trial, a State forensic pathologist testified the heart wound would have killed the deceased soon after its infliction. He further explained the offense was "a very typical sex murder" and while it was "a brutal death," it was not "extremely" brutal. *Id.* We held:

> ... We cannot conclude the circumstances of the offense are so heinous or evince an "aberration of character" so peculiarly "dangerous" as alone to justify an affirmative response to the second special issue.... To hold the offense itself in this cause was sufficient to prove future dangerousness would threaten to undermine the function of Article 37.071, supra, to further narrow the class of death-eligible offenders to less than all those who have been found guilty of an offense as defined under [Penal Code] § 19.03....

*Smith*, 779 S.W.2d at 419–420.

Similarly, in *Brasfield v. State*, 600 S.W.2d 288 (Tex.Cr.App.1980), the defendant kidnapped and murdered a six-year-old boy. A pathologist testified the deceased died of asphyxiation. Additionally, the deceased received a heavy blow to the head, leaving a bruise, as well as numerous stab wounds, inflicted after death. *Id.*, at 292. The deceased's trousers were pulled down around his legs, but his body was in too advanced a stage of decomposition to determine whether he had been sexually molested. The State offered no evidence at punishment that the defendant would constitute a continuing threat to society. And the defendant presented no mitigating evidence. Reviewing the evidence, we held that although "... we have a crime of violence adequately supported by the circumstantial evidence ... we are led to the inescapable conclusion that the evidence was insufficient to support an affirmative answer to the second issue." *Id.*, at 293–294.

In *Keeton*, 724 S.W.2d 58, the defendant entered a grocery store and, without warning, shot a clerk and fired at the store owner. He then went behind the counter and stole the complainants' purses. In *Roney v. State*, 632 S.W.2d 598 (Tex.Cr.App.1982), during a grocery store robbery, the defendant, without provocation, shot a store clerk after receiving the money. Another clerk testified at trial that the deceased had his hands raised when he was shot. *Id.*, at 602. Finally, in *Beltran v. State*, 728 S.W.2d 382 (Tex. Cr.App.1987), the defendant shot the deceased immediately after she handed him the money from the cash drawer during a robbery of a tortilleria. While acknowledging in each of the three cases that the killings were senseless and unnecessary, we nevertheless held the circumstances of the offenses were not so brutal as to prove in themselves that any of the three defendant's posed a continuing threat to society.

■ The circumstances of the offense in the instant case are distinguishable from *Smith, Brasfield, Keeton, Roney,* and *Beltran.* Appellant shot Thompson twice; both shots were fired at extreme close range and both shots were fatal. Significantly, appellant shot Thompson in the head as she was either kneeling or sitting on the floor after

the infliction of the first wound to her abdomen. Appellant's infliction of multiple wounds at close range indicates a wanton and callous disregard for human life not present in the aforementioned cases. *See, Johnson v. State,* 853 S.W.2d 527, 531–533 (Tex.Cr. App.1992); *Bower v. State,* 769 S.W.2d 887, 890, 895 (Tex.Cr.App.1989); *and, Livingston v. State,* 739 S.W.2d 311, 340 (Tex.Cr.App. 1987).

Of even greater significance for our review is the indication that appellant spent considerable effort in hunting down the second deceased, Cutler, before killing her. After Cutler locked herself into an adjacent room, appellant attempted to get in by shooting the doorknob. Appellant then tore down a wicker shelf covering a receptionist window, broke the window, reached inside and shot Cutler as she crouched in a corner. We believe this evidence suggests appellant committed the second murder in order to eliminate a witness to his first murder. In *Johnson,* 853 S.W.2d at 532–533, we upheld the jury's affirmative answer to the second punishment issue where the defendant committed two murders for the purpose of eliminating the witnesses to an extraneous burglary. We believe the circumstances of the second homicide likewise evince an intent to eliminate a witness.

### 2. and 3. Calculation and Forethought of the Offense

We have also examined the calculated nature of a defendant's acts and the forethought with which he planned and executed his crime in order to determine his propensity to commit future acts of violence. *O'Bryan,* 591 S.W.2d at 480.

In *Ellason v. State,* 815 S.W.2d 656 (Tex. Cr.App.1991), the defendant was convicted of capital murder after he stabbed an elderly neighbor to death when she awoke and recognized him as he burglarized her home. The evidence indicated the defendant entered the deceased's house unarmed and stabbed the deceased in a "split second decision" after panicking upon being recognized. *Id.,* at 659. In reforming the defendant's death sentence, we observed:

... There is no evidence that appellant preplanned the burglary or the murder. Appellant's murder of [the deceased] appears to have been an immediate reaction to being recognized by [the deceased] after she unexpectedly awoke ... Moreover, the facts show that appellant entered [the deceased's] residence unarmed and did not look for a weapon with which to arm himself while burglarizing [the deceased's] residence.

*Id.,* at 662.

In *Smith,* 779 S.W.2d 417, despite evidence that the defendant loitered around the deceased's apartment complex, ostensibly looking for opportunities to engage in sexual relations, we held there was no evidence the defendant had pre-planned either the rape or the murder. *Id.,* at 420–421.

In *Warren v. State,* 562 S.W.2d 474 (Tex. Cr.App.1978), the defendant was convicted of capital murder committed in the course of a burglary. While burglarizing the deceased's home, the defendant found a pistol. Later, the deceased discovered the defendant and threatened to kill him. In response to the threat, the defendant shot the deceased. In reforming the defendant's death sentence, we noted that he had only intended to burglarize the deceased's home and had acted under provocation. *Id.,* at 476. We concluded that "the facts of the instant case reflect a criminal act of violence, *but it was not a calculated act.*" *Id.*

In contrast to the above cases, there is evidence of pre-planning in the case before us. Appellant stated in his confession that he had arranged the meeting with Thompson for the purpose of dissuading her from filing charges for bad checks he had written her. Appellant made the appointment under a fake name. The day before their meeting, appellant purchased the .357 revolver and the ammunition which he used to kill both victims. Prior to meeting with Thompson, appellant secreted two pistols in his sling. We infer from these actions appellant anticipated a conflict and armed himself in preparation. *But see, Beltran,* 728 S.W.2d at 390 ("there was no showing that ... violence was intended although the appellant was armed when he entered the store"). Consequently, we

conclude some amount of pre-planning went into the offense.

### 4. Character Evidence

 Evidence concerning a defendant's character is a relevant consideration of whether he poses a continuing threat to society. *Wilkerson,* 881 S.W.2d at 343 (Baird, J., dissenting). Appellant presented testimony by a number of witnesses during guilt/innocence and punishment, all of whom characterized appellant as non-violent and non-aggressive. They further testified that because appellant was non-violent, he was unlikely to commit future acts of violence. The State presented no evidence in rebuttal.

In *Smith,* 779 S.W.2d at 419, witnesses for both the prosecution and the defense uniformly characterized the defendant as a nonviolent person using adjectives such as "mild mannered" and "gentle." *Id.,* at 421. Further evidence showed appellant was considered a "hero" by a local office of the Texas Employment Commission because appellant had once subdued a man assaulting a TEC employee. *Id.* Reviewing this evidence, we stated:

> Considering the uncontested testimony of appellant's nonviolent character, we cannot say that the inferences urged upon us by the State are adequate to persuade a rational jury of a "probability" appellant would commit future acts of violence.

*Id.*

In *Rosales v. State,* 841 S.W.2d 368 (Tex. Cr.App.1992), however, we held the defendant's unrebutted evidence of good character was insufficient to overcome the jury's determination that appellant constituted a continuing threat to society. *Id.,* at 382.

In the instant case we find the unrebutted evidence of appellant's good and peaceful character to be a mitigating factor. Nonetheless, the extent to which appellant's unrebutted character evidence mitigates the offense must be weighed against the other *Keeton* factors.

### 5. Other Evidence

 Neither the State nor appellant presented any other evidence, such as psychological evidence or past criminal history, which we typically review under the *Keeton* framework. Nonetheless, the absence of this evidence does not automatically undermine a jury's affirmative answer to the second punishment issue. *See, Rosales,* 841 S.W.2d at 382 ("... [P]sychiatric evidence is not essential [to prove future dangerousness]."); *Wilkerson,* 881 S.W.2d at 336 (Baird, J., dissenting); *Black,* 816 S.W.2d at 355 (lack of prior criminal record offset by other considerations); *and, Livingston,* 739 S.W.2d at 340 ("[L]ack of extraneous violent acts, reputation or psychiatric testimony on issue of future dangerousness does not alone negate finding under Art. 37.071(b)(2)."). *But see, Smith,* 779 S.W.2d at 421 (death sentence reformed, in part because of no evidence of past criminal or violent conduct as well as lack of bad reputation evidence).

 In weighing the factors enunciated in *Keeton,* we find the evidence supports the jury's affirmative answer to the second punishment issue. The evidence presented at trial shows the offense was both premeditated and brutal. The purchase of the murder weapon the day before the murders, the making of the appointment under a fake name, and the secretion of the weapons prior to meeting with Thompson indicates premeditation. The brutality of appellant's act is readily apparent by his having shot Thompson twice and then hunting down Cutler in order to eliminate a witness. Although the character evidence is uniformly favorable to appellant, we find this evidence alone insufficient to mitigate the premeditation and brutality of the offense. **Appellant's twenty-first point of error is overruled.**

The judgment of the trial court is affirmed.

McCORMICK, P.J., and WHITE and MEYERS, JJ., concur with the following note: Regarding appellant's eighth point of error, we do not agree that the trial judge abused his discretion by limiting trial counsel's questions. Therefore we can only concur in the result since the majority holds harmless the alleged error. We otherwise join the majority opinion.

MALONEY, J., concurs in the result reached in Part III and otherwise joins the opinion.

CLINTON, Judge, dissenting.

In his first two points of error appellant argues that the trial court erred in failing to grant his motion to quash the indictment. He claims on appeal that the indictment is defective in that it does not allege the culpable mental state of intentional or knowing *vis-a-vis* the second alleged murder victim. In his motion to quash appellant complained that the indictment was deficient in that it failed to allege "all the essential acts and omissions by the Defendant necessary to constitute a violation of Section 19.02 [sic?] of the Penal Code of the State of Texas." He nowhere complained, however, of a failure to allege every requisite culpable mental state. He has therefore forfeited that particular complaint on appeal. Article 1.14(b), V.A.C.C.P.; *Studer v. State*, 799 S.W.2d 263 (Tex.Cr.App.1990). The Court should not reach the merits of appellant's contention at all.

Moreover, in treating the merits, the Court errs. The Court considers it a foregone conclusion that the second murder under V.T.C.A.Penal Code, § 19.03(a)(6) is nothing but an aggravating feature. It is true, as the State notes in its brief, that in another context this Court has indeed designated the second murder as "merely the aggravating circumstance that renders 'capital' the murder of the person" first alleged in the indictment. *Narvaiz v. State*, 840 S.W.2d 415, at 433 (Tex.Cr.App.1992). It seems to me this proposition requires a more searching scrutiny than the Court has afforded it so far. Failing that, the Court here falls back on a host of cases holding that it is not necessary to allege the constituent elements of the aggravating feature of a capital murder to allege a complete offense. Maj. op. at 338. But the Court has also held, in essence, that if the State chooses to allege an aggravating feature not by simply naming it in the indictment, but by alleging the constituent elements thereof, it must allege all of the constituent elements. See *Ex parte Cannon*, 546 S.W.2d 266 (Tex.Cr.App.1976) (burglary indictment which did not allege entry with intent to commit "theft," instead alleging entry with intent to commit the requisite elements of theft, but which left out one element thereof, did not allege an offense, and therefore could not support conviction for burglary). That the indictment here later alludes to "said murders" does not save it, *Davila v. State*, 547 S.W.2d 606 (Tex.Cr.App.1977) notwithstanding, because the indictment has only alleged the constituent elements of one murder up to that point, and hence has not theretofore "*said* murders." [1] Thus, in my view, had appellant raised his contention timely in the trial court, it would have been a valid complaint.

In any event, appellant did adequately call attention to the defect in the jury charge, *viz:* failure of the application paragraph to require the jury to find that appellant caused the second victim's death "intentionally or knowingly." I cannot concur, therefore, in the Court's disposition of his third point of error on the basis of procedural default, as I can its disposition of appellant's first two points of error. Reaching the merits of the third point of error, as it should, the Court fails to recognize it is any error at all to fail to require in the application paragraph that the jury find an elemental culpable mental state before it is authorized to convict. In this I cannot join.

Simply put, the application paragraph here did not require the jury to find every requisite element of the offense of capital murder under § 19.03(a)(6)(A) as a predicate to conviction. The Court holds that it need not, because the allusion later in the application paragraph to "both of said murders" was enough to refer the jury back to the abstract definition of murder appearing earlier in the charge, whereby the jury would have recognized the need to find that the second murder was committed intentionally or knowingly before it could convict. This observation, in combination with compelling evidence appellant did indeed intentionally or knowingly commit both murders, might be sufficient to establish appellant did not suffer egregious

1. All emphasis added.

harm from the defect in the application paragraph. Thus, I might be persuaded there was no fundamental error in the jury charge, as defined by *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr.App.1985) (Opinion on State's motion for rehearing). But that is not the standard to be used here, since appellant objected to the jury charge in this cause. Instead the question is simply whether "some harm" resulted from the error. *Arline v. State*, 721 S.W.2d 348 (Tex.Cr.App. 1986). The application paragraph required the jury to find appellant caused the death of the first victim "intentionally or knowingly." That requirement was conspicuously absent as pertains to the second victim. That the application paragraph later alluded to "both of said murders," even if that were sufficient to direct the jurors to the abstract definition of murder found earlier in the jury charge, would at best serve to confuse, rather than to clarify. Given this charge, there is a genuine possibility the jury did not feel obliged to find the second murder was committed intentionally or knowingly—an element of the offense—before it was authorized to convict appellant of capital murder. Surely that is enough to constitute "some harm." For, however compelling the evidence of intent may have been, both the Sixth Amendment to the United States Constitution and Article 1.14(a), V.A.C.C.P., guarantee appellant a jury finding on that issue before he can be lawfully convicted of capital murder.

For this reason the judgment of the trial court should be reversed and the cause remanded for a new trial. Because the Court does not, I dissent. I write further to address what I consider to be deficiencies in the Court's treatment of several other points of error.

In his sixth point of error appellant complains that he was deprived of equal protection of the laws under the Fifth Amendment to the United States Constitution when the trial court declined to submit the special issues at the punishment phase of trial that are contained in the 1991 legislative amendment to Article 37.071. Applying the pre-amendment version of Article 37.071, appellant contends, denied him the benefit of the mitigation instruction that was added to the statute by Acts 1991, ch. 838, § 1, p. 2899, eff. Sept. 1, 1991. However, Section 5 of that same amendment expressly provided that it "applies only to an offense that is committed on or after September 1, 1991." Thus, although appellant's trial commenced in October of 1991, after the effective date of the amendment, because the offense occurred in September of 1990, by its express terms the amendment does not apply to him.[2] Moreover, the amendment does not apply to *any* capital murderer who committed his offense before September 1, 1991. Every capital murderer thus situated will have special issues submitted at the punishment phase of trial according to the provisions of Article 37.071 as it read prior to the 1991 amendment. Because all similarly situated capital murder defendants are treated the same, there simply is no colorable equal protection claim. Nothing more need be said. The Court's discussion of "fundamental rights" and "suspect classifications" is confusing, and, anyway, superfluous.

The Court disposes of appellant's tenth and eleventh points of error by agreeing with the State's contention that the appointment book notation and patient application form were not admitted for the truth of the matters asserted therein, but only to explain to the jury "how the officers came to suspect [a]ppellant and seek him out." The State argues that such items, "offered for the purpose of showing what was said therein, rather than for the truth of the matter asserted,

---

**2.** Were appellant to be tried for the first time for this offense today, he would be entitled to the mitigation instruction he sought, but only by virtue of the recent promulgation of Article 37.0711, V.A.C.C.P. This new statute was added by Acts 1993, ch. 781, § 2, pp. 3060–3061, eff. Aug. 30, 1993. By its express terms the new statute is retroactive; that is, it expressly applies to offenses committed before September 1, 1991. Nevertheless, in the two years between September 1, 1991 and September 1, 1993, trial of every capital offense that occurred prior to September 1, 1991 was to be conducted under the provisions of Article 37.071 as it read when the offense was committed. Appellant does not here argue (nor could he have argued, as of the date his appellate brief was filed) that the 1993 amendment somehow retroactively denied him equal protection of law.

do not constitute hearsay."[3] The Court uncritically accepts this proposition, parrots a number of cases in support thereof, and is done with it. Maj. op. at 347.

But that is not the end of the matter. The appropriate question to ask next, of course, is whether the substance of the out of court declaration—"what was said"—has any relevance at all *apart* from the truth of the matter asserted. How appellant came to be a suspect in the case does not seem to me to have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex.R.Cr.Evid., Rule 401. In any event, the State, as proponent of the evidence, did not articulate this or any other non-truth-of-the-matter-asserted basis for admitting the evidence at trial.

This suggests that in all likelihood the State had no other purpose in mind. The "matter asserted" in the appointment book is that somebody with a name very similar to appellant's was scheduled to be at the scene of the killings at the very time they occurred. "[T]he probative value" of that statement "as offered flows from declarant's belief as to the matter." Tex.R.Cr.Evid., Rule 801(c). Likewise, the "matter ... implied" by the patient application form is that somebody with appellant's name actually showed up at the appointed time; and one would assume that the value of this statement "as offered" also "flows from the declarant's belief" that that was indeed his name. *Id.* These statements have no relevance that I can see apart from these express or implied matters asserted. Obviously the State hoped the jury would infer from these writings that appellant was at the scene at the time of the killings. Because that is the most obvious probative value the appointment book notation and patient application form have—indeed, the only probative value I can see—appellant's hearsay objection should have been sustained.

Having already concluded the trial court reversibly erred in this cause, I need not decide whether overruling appellant's hearsay objection was harmless beyond a reasonable doubt under Tex.R.App.Pro., Rule 81(b)(2).

I respectfully dissent.

---

3. Had the State proffered these items as business records, it would not now have to argue that they were admissible for reasons other than the truth of the matters asserted therein, since under Tex. R.Cr.Evid., Rule 803(6), they would have been admissible for that purpose. However, the State made no such proffer.