**Affirmed and Opinion Filed May 30, 2024**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-23-00331-CR**

**LAWRENCE EDWARD BELL, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 401st Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 401-81917-2022**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Nowell, and Smith
Opinion by Justice Partida-Kipness

A jury convicted Appellant Lawrence Bell of murder and assessed punishment at ninety-nine years' imprisonment. The trial court entered judgment in accordance with the jury's verdict. Bell raises two issues on appeal: (1) the trial court abused its discretion by denying Bell's motion to suppress and admitting evidence obtained in violation of Bell's constitutional rights; and (2) the trial court erred by permitting the State to comment on Bell's exercise of his right against self-incrimination. We affirm.

# BACKGROUND

## I.     The DART Train Shooting

On March 18, 2022, just after 6:00 a.m., James Ravenell was seated on a southbound DART light-rail train traveling from Plano toward Dallas. As the train pulled into the CityLine/Bush station in Richardson, a black male riding the train approached Ravenell. This man wore brown coveralls, a blue hoodie, a greenish multi-colored beanie, black gloves, and brown work boots. He was also carrying a large black backpack and a yellow plastic bag. As the train stopped and the doors opened, the man pulled a pistol from the upper left side of his coveralls and shot Ravenell in the chest. The shooter then walked off the train. DART video-surveillance cameras aboard the train captured the entire incident. Ravenell later died from the gunshot wound after his family removed him from life support.

## II.     The Investigation

DART Police Detective Eric Carlson was dispatched to the CityLine/Bush station shortly after the shooting. He began investigating the crime scene and taking photographs. After reviewing the DART surveillance footage in slow motion, Carlson was able to locate the discharged .45-caliber cartridge case on the ground by the train track. Using images from the DART video, Detective Carlson issued a "Be-On-the-Lookout" bulletin (BOLO) for the suspect.

Detective Carlson spent nearly two weeks reviewing other DART videos along the DART light rail system. He was able to track the suspect's movements

backwards in time for the nine hours preceding the shooting. Carlson took a screenshot from one of the videos which showed a good view of the suspect's face. Detective Carlson then updated the BOLO with photographs from the video. The BOLO described the individual as wearing brown coveralls, a blue hoodie, olive green hat, brown boots, and black gloves, carrying a black backpack and yellow drawstring bag. The BOLO indicated the suspect was wanted for murder and should be considered armed and dangerous, and further instructed that upon contact, officers should detain and identify the suspect and contact Detective Carlson.

Based on their experience, DART Police believed the suspect was likely homeless due to his extended travels on the DART trains throughout the night. Accordingly, the police began canvassing homeless shelters. On March 31, 2022, Detective Carlson took photographs from the DART video to The Bridge homeless shelter in Dallas. An employee identified Bell from the photographs. Carlson then updated the BOLO with Bell's name, date of birth, and physical descriptors.

The next day, April 1st, Detective Carlson met with Tommy Jones, director of security at OurCalling homeless outreach center. Carlson showed Jones a photograph of Bell. Jones was familiar with Bell and indicated Bell had been at the center on March 29th. Jones had captured the visit on video and sent it to Detective Carlson on the afternoon of April 1st. In the video, Bell is seen wearing brown coveralls, brown boots, and a greenish beanie, and is carrying a large black backpack.

## III. Bell's Detention and Arrest

On April 1st—the same day Detective Carlson spoke to Tommy Jones—DART Officers Neal and Villafuerte were on patrol at a DART train station in downtown Dallas. Prior to starting his shift, Officer Neal had reviewed the Bell BOLO. According to Neal, the brown coveralls the suspect was wearing in the BOLO photos stood out to help identify the individual.

At approximately 7:20 p.m., Officer Neal observed a black male wearing brown coveralls exiting a convenience store directly across from the DART station platform, approximately thirty feet from Neal. Officer Neal told Officer Villafuerte the individual looked like the person in the BOLO. Neal and Villafuerte waited for an incoming train to pass, then crossed the tracks and located the individual, who had boarded another DART train at the station.

Officer Neal entered the train and approached the subject with his pistol drawn at the "low-ready" position.[1] Neal commanded the individual to raise his hands and face the train wall. Another officer handcuffed the man, and together the officers escorted him off the train and sat him on a nearby platform bench. The man did not resist or struggle, and video of the arrest does not show any physical force being used by DART officers. The suspect had a large black backpack in his possession.

---

[1] In the "low-ready" position, the officer's pistol is drawn but held at the officer's side, pointing down at the ground.

When asked, the man identified himself as "Lawrence Bell." Officer Neal then reviewed the BOLO on his mobile phone and confirmed Bell matched the suspect thereon. Neal then performed a pat-down search of Bell, which revealed a .45-caliber, 1911-style pistol in the upper left pocket of Bell's brown coveralls. The pistol was loaded, cocked, and ready to fire. Officer Neal unloaded and cleared the pistol, and police continued the pat-down of Bell.

Per the BOLO's instructions, Neal placed Bell in a squad car and carried him to DART Police headquarters to meet with Detective Carlson. At headquarters, DART officers escorted Bell to a room for questioning, at which time they removed his handcuffs.

At headquarters, Detective Carlson continued the investigation. Carlson gave Bell his *Miranda* warnings,[2] but Bell refused to sign the associated card acknowledging those rights and did not wish to participate in the interview. Around this time, Detective Carlson learned from independent investigation that the handgun Bell possessed was stolen and Bell was a convicted felon, prohibiting him from possessing a firearm. Shortly thereafter, Carlson formally arrested Bell. Police then inventoried and searched Bell's backpack in the DART evidence room. Inside the backpack were loaded .45-caliber handgun magazines, a box of ammunition, black

---

[2]  *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

gloves, and a greenish multi-colored beanie. Bell was later indicted for Ravenell's murder.

## IV.    Trial Proceedings

Prior to trial, Bell moved to suppress evidence recovered from Bell and statements made during questioning by DART Police. Bell asserted he had been subject to an illegal, warrantless arrest and unlawful questioning. The State responded to the motion, arguing Bell's detention was a lawful temporary detention and *Terry* frisk,[3] and further argued Bell's detention was a lawful warrantless arrest under Articles 14.01 and 14.04 of the Code of Criminal Procedure. At the related hearing, the court received testimony from Officer Neal and Detective Carlson, along with the DART videos from the March 18th murder, the BOLOs, and body-camera videos from Officer Neal and Detective Carlson showing Bell's detention, questioning, and arrest.

The trial court denied Bell's motion to suppress. The court ruled Bell was subject to an investigative detention based upon reasonable suspicion. The court also ruled that, even if Bell's detention was a custodial arrest, it was proper under Articles 14.03(a)(1) and 14.04 of the Code of Criminal Procedure.

At trial, the jury heard testimony from Officer Neal and Detective Carlson on the murder investigation and the circumstances leading up to Bell's detention, interview, and arrest. The jury was shown the DART videos showing the murder and

---

[3]    *Terry v. Ohio*, 392 U.S. 1, 24, 88 S. Ct. 1868, 1881, 20 L. Ed. 2d 889, 907 (1968).

the suspect's travels along the DART rail system during the hours leading up to the murder. The jury also heard testimony from a firearms examiner, who determined the .45-caliber cartridge case found at the scene of the murder was fired from the pistol in Bell's possession. A .45-caliber bullet recovered at the hospital among Ravenell's clothes could not be identified or eliminated as having been fired by the pistol. A physician testified Ravenell's death resulted from homicide. The jury also heard testimony from a witness near the shooting, other investigating officers, and Ravenell's sister.

The jury found Bell guilty of murder as charged in the indictment. After receiving evidence and argument in the punishment phase of trial, the jury assessed punishment at ninety-nine years' imprisonment. The trial court entered judgment in accordance with the jury's verdict.

## STANDARDS OF REVIEW

### I.    Motions to Suppress

We review the trial court's ruling on a motion to suppress for an abuse of discretion and apply a bifurcated standard of review, affording almost complete deference to the trial court's determination of historical facts, especially when those determinations are based on assessments of credibility and demeanor. *Wells v. State*, 611 S.W.3d 396, 405 (Tex. Crim. App. 2020). We review the court's application of search and seizure law de novo. *Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002). When the trial court does not file findings of fact concerning its ruling

on a motion to suppress, we assume the court made implicit findings that support its ruling, if supported by the record. *Ex parte Moore*, 395 S.W.3d 152, 158 (Tex. Crim. App. 2013). We will uphold the trial court's decision so long as it is correct under some theory of law applicable to the case. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007); *Callahan v. State*, No. 05-08-01286-CR, 2010 WL 522787, at *2 (Tex. App.—Dallas Feb. 16, 2010, no pet.) (mem. op., not designated for publication).

## II.    Right Against Self-incrimination

A comment on a defendant's post-arrest silence violates the prohibition against self-incrimination because it is akin to a comment on a failure to testify and raises an inference of guilt arising from the invocation of a constitutional right. *Dinkins v. State*, 894 S.W.2d 330, 356 (Tex. Crim. App. 1995); *Knowles v. State*, No. 05-20-00410-CR, 2022 WL 3714516, at *4 (Tex. App.—Dallas Aug. 29, 2022, no pet.) (mem. op., not designated for publication) (citing *Dinkins*, 894 S.W.2d at 356). Because the error affects constitutional rights, we analyze harm under Texas Rule of Appellate Procedure 44.2(a). *Knowles*, 2022 WL 3714516, at *4. Rule 44.2(a) requires reversal in cases involving constitutional error "unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a).

**ANALYSIS**

Bell raises two issues on appeal: (1) the trial court abused its discretion by denying Bell's motion to suppress and admitting evidence obtained in violation of Bell's constitutional rights; and (2) the trial court erred by permitting the State to comment on Bell's exercise of his right against self-incrimination. We address each issue in turn.

## I. The Trial Court Did Not Abuse Its Discretion in Denying the Motion to Suppress

In his first issue, Bell asserts evidence admitted at trial was the fruit of an unlawful arrest and should have been suppressed. The State contends Bell's seizure was a lawful investigative detention, not an arrest. The trial court denied Bell's motion to suppress, concluding the seizure of Bell was a lawful investigative detention. However, the court alternatively ruled that even if the seizure constituted a warrantless arrest, it was authorized by Article 14.04 of the Code of Criminal Procedure.[4] Bell does not address this alternative ground on appeal.

We conclude Bell procedurally defaulted on this issue, but even if he had not, Bell's seizure and search were incident to a lawful arrest. Accordingly, the trial court did not abuse its discretion in denying Bell's motion to suppress.

---

[4] Article 14.04 authorizes a warrantless arrest "[w]here it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant." TEX. CODE CRIM. PROC. art. 14.04.

## A. Procedural default

We address issues of error preservation sua sponte before reversing a criminal conviction. *See Darcy v. State*, 488 S.W.3d 325, 327–28 (Tex. Crim. App. 2016). Thus, we must examine whether Bell has procedurally defaulted his challenge to the trial court's suppression ruling by failing to argue on appeal a theory of law applicable to the case. *See State v. Copeland*, 501 S.W.3d 610, 613 (Tex. Crim. App. 2016).

We must uphold a trial court's ruling on a motion to suppress if the ruling is correct under any theory of law applicable to the case. *Id.* at 612–13. A "theory of law" is applicable to the case if the theory was presented at trial in such a manner that the appellant was fairly called upon to present evidence on the issue. *Id.* at 613. "If the appellant fails to argue a 'theory of law' applicable to the case on appeal, that argument is forfeited." *Id.* An appellant procedurally defaults a theory of law applicable to the case if the appellant fails to advance that argument on appeal. *Mixon v. State*, 523 S.W.3d 765, 767–68 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) (citing *Copeland*, 501 S.W.3d at 614). Under these circumstances, the court of appeals will uphold the trial court's ruling without considering the merits of the unchallenged basis for the ruling. *Id.*; *Snell v. State*, No. 01-22-00502-CR, 2023 WL 8587672, at *7 (Tex. App.—Houston [1st Dist.] Dec. 12, 2023, pet. dism'd) (mem. op., not designated for publication).

Here, at the hearing on the motion to suppress, the State and Bell joined issue on whether Bell's seizure by DART Police constituted an investigative detention or arrest. The State offered evidence from Officer Neal, who testified as to the circumstances of Bell's detention and transport to DART Police headquarters. The State also offered testimony from Detective Carlson, who explained the investigation into the March 18th murder on the DART train and the creation of the BOLO upon which Officer Neal relied when detaining Bell. Bell's counsel cross-examined Officer Neal and Detective Carlson and offered evidence in support of the motion to suppress.

At the close of the evidence on the motion to suppress, the trial court asked the parties why Article 14.04 would not apply in the circumstances. Both Bell and the State argued their positions. The trial court received case law from both sides and deferred ruling on the motion. The next day, the trial court ruled on the motion, holding Bell's seizure was an investigative detention rather than an arrest. However, the court alternatively ruled that, even if an arrest occurred, it was justified under Article 14.04.[5]

Later, after the jury began deliberations in the guilt/innocence phase of the trial, Bell's counsel re-urged the motion to suppress and expressly argued Article

---

[5] The trial court also concluded Bell's arrest was justified under Article 14.03(a)(1), which permits a warrantless arrest of "persons found in suspicious places and under circumstances which reasonably show that such persons have been guilty of some felony…." TEX. CODE CRIM. PROC. art. 14.03(a)(1). We need not address this ground because, as discussed next, we conclude Bell's arrest was authorized under Article 14.04.

14.04 did not apply to the circumstances. The trial court again denied the motion to suppress.

However, on appeal Bell has not challenged or addressed this alternative ground for the trial court's denial of the motion to suppress. We conclude the issue of whether the evidence was discovered attendant to a lawful arrest under Article 14.04 was a theory of law applicable to the case. Bell was "fairly called upon to present evidence on the issue," and did so. *Copeland*, 501 S.W.3d at 613; *Snell*, 2023 WL 8587672, at *8; *Mixon*, 523 S.W.3d at 769. Both parties made arguments to the trial court about the search-incident-to-arrest exception under Article 14.04. And, the trial court expressly cited Article 14.04 as an alternative ground for denial of the motion to suppress.

Under these circumstances, Bell was "aware (or should have been)" that by losing on his motion to suppress, he would need to argue on appeal that Article 14.04 does not apply. *Copeland*, 501 S.W.3d at 613; *Snell*, 2023 WL 8587672, at *8; *Mixon*, 523 S.W.3d at 769. However, Bell has not challenged that theory of law on appeal. Therefore, Bell has procedurally defaulted by not advancing an argument on that theory, and we must uphold the trial court's denial of the motion to suppress without considering the merits of the unchallenged basis for the ruling. *Copeland*, 501 S.W.3d at 613; *Snell*, 2023 WL 8587672, at *8; *Mixon*, 523 S.W.3d at 769.

**B.    The seizure was a lawful arrest under Article 14.04**

Even if Bell had not procedurally defaulted, the record supports the trial court's conclusion Bell's arrest was authorized by Article 14.04.

Article 14.04 authorizes a warrantless arrest "[w]here it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant." TEX. CODE CRIM. PROC. art. 14.04. In order for a warrantless arrest or search to be justified, the State must show the existence of probable cause at the time the arrest or search was made and the existence of circumstances which made the procuring of a warrant impracticable. *Crane v. State*, 786 S.W.2d 338, 346 (Tex. Crim. App. 1990). Probable cause exists where the facts and circumstances within the officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a particular person has committed or is committing an offense. *Amores v. State*, 816 S.W.2d 407, 413 (Tex. Crim. App. 1991).

The test for probable cause in the case of police broadcasts is the information known to the officer who made the broadcast request. *Crane*, 786 S.W.2d at 346 (citations omitted). The requesting officer need not relate all the relevant facts, but only such information as is necessary for the arresting officer to know who is wanted. *Id.* Police broadcasts, based on probable cause, reporting a felony and a description of the suspect satisfy the requirements for arrest under Article 14.04. *Id.*

Article 14.04 does not require a showing the offender was in fact about to escape, nor does it require a showing there was in fact no time to procure a warrant. *Id.* at 347. The statute "merely requires a showing that there is *satisfactory proof from representations by a credible person* that the felony offender 'is about to escape, so that there is no time to procure a warrant.'" *Id.* (emphasis in original). The police officers themselves may observe conduct which indicates the offender is about to escape. *Id.*

Here, the facts and circumstances demonstrate probable cause and the existence of circumstances which made the procuring of a warrant impracticable. At the hearing on the motion to suppress, the State offered and published the video from inside the DART train which depicted the murder. The video showed a suspect matching Bell's appearance withdraw a handgun from the upper pocket of his brown coveralls and shoot Ravenell. Detective Carlson reviewed this video and spent almost two weeks reviewing hours of additional video from dozens of DART trains and stations. Carlson was able to use this video to track the suspect's movements along the DART rail system during the nine or ten hours prior to the shooting.

Detective Carlson obtained several screenshots of the suspect from the video, including a view of the suspect's face. Based on this preliminary information, DART police issued a March 30, 2022 BOLO that included several photos of the suspect from the DART videos. The BOLO described the suspect was last seen wearing brown coveralls, a blue hoodie, a green hat, tan boots, and black gloves. The BOLO

–14–

also indicated the suspect was wanted for the March 18, 2022 murder on the DART train and should be considered armed and dangerous.

On March 31st, Carlson visited The Bridge homeless shelter, where an employee identified Lawrence Bell from photos taken from the DART video. Carlson then updated the BOLO with Bell's name, height, weight, last known address, and larger photos of Bell's face. On April 1st, Detective Carlson met with Tommy Jones at OurCalling homeless outreach ministry. Jones said Bell had been there on March 29th. Jones provided Carlson with video that showed a subject matching Bell's description wearing brown coveralls, a greenish multi-colored beanie, white t-shirt, brown boots, and carrying a large black backpack.

Later that day, Officers Neal and Villafuerte were working at a DART station in downtown Dallas. Neal had previously reviewed the BOLO, and understood the subject therein was considered armed and dangerous and should be detained for questioning. Neal testified the BOLO's photographs helped identify the individual and the suspect's brown coveralls "stood out." While at the station, Officer Neal observed a black male wearing brown coveralls exit a convenience store directly across from the DART station. Neal told Officer Villafuerte it was possibly the individual from the BOLO. Officer Neal then located Bell on a DART train.[6]

---

[6] The events from the time the Officer Neal observed Bell on the DART train through Bell's transport to DART Police headquarters were captured on video by Neal's body camera. The video was admitted into evidence and played at the motion-to-suppress hearing.

As Officer Neal approached Bell on the train, Neal's weapon was drawn, but at his side and pointed downward in the "low-ready" position. Neal stated such action was for officer and public safety, considering the BOLO indicated Bell might be armed and dangerous. Officer Neal instructed Bell to keep his hands up and visible, and then ordered Bell to stand up and face away toward the train wall. Contrary to Bell's assertions, DART officers did not order or place Bell on the ground. Then, the officers handcuffed Bell and escorted him off the train and onto a nearby bench.

Bell did not resist or struggle, and the video of the arrest does not show any physical force being used by DART officers. Bell gave his name, and after confirming Bell's identity on the BOLO, Officer Neal patted down Bell. During this pat-down, Neal located a .45-caliber, 1911-style handgun in the chest pocket of Bell's coveralls. Police placed Bell in a squad car and carried him to DART Police headquarters to meet with Detective Carlson.

Based on the foregoing, Officer Neal had probable cause to conclude Bell had committed a felony, was about to escape, and obtaining a warrant would be impracticable. At the time of his encounter with Bell, Officer Neal was armed with the knowledge and information from Detective Carlson's BOLO. This updated BOLO contained Bell's name, a physical description, clear photos of Bell's clothing and face, and indicated Bell was wanted for questioning in connection with the March 18th murder. That BOLO was based on Carlson's review of the shooting on

the DART train video, additional hours of video review showing the suspect's movements in the hours leading up to the shooting, and interviews with homeless shelter employees who identified Bell. Furthermore, Bell had just boarded a DART train, and Officer Neal certainly could have concluded Bell was about to escape. Officer Neal then approached and detained Bell. Neal confirmed Bell's identity against the BOLO within ninety seconds of first contact with Bell.

Accordingly, under the circumstances, even if Bell's detention was an arrest, it was authorized under Article 14.04. *See Crane*, 786 S.W.2d at 346-47 (Oklahoma authorities had probable cause to make warrantless arrest of defendant for murder based on Texas police broadcast of defendant's description and crime by officer who had interviewed witnesses and who had sufficient probable cause to justify detention of defendant); *Hill v. State*, No. 05-91-00125-CR, 1991 WL 258720, at *3 (Tex. App.—Dallas Dec. 6, 1991, no pet.) (not designated for publication) (officers had probable cause to stop defendant's car and make Article 14.04 warrantless arrest, based on complainant's report of wife's kidnapping which included a description of defendant's car, defendant's name, and appearance).

After confirming Bell's identity, Officer Neal pat down Bell and discovered the .45-caliber pistol ultimately linked to Ravenell's murder. This search was authorized as incident to Bell's arrest. *See Crane*, 786 S.W.2d at 347 (evidence seized from defendant's person and vehicle was a product of a lawful Article 14.04 arrest and therefore admissible). Similarly, the search and inventory of Bell's

backpack in the DART Police evidence room after his arrest was permissible. *See*

*Illinois v. Lafayette*, 462 U.S. 640, 648, 103 S. Ct. 2605, 77 L.Ed.2d 65 (1983) ("[I]t

is not 'unreasonable' for police, as part of the routine procedure incident to

incarcerating an arrested person, to search any container or article in his possession,

in accordance with established inventory procedures.").

### C.     Conclusion regarding the motion to suppress

Based on the foregoing, the trial court did not abuse its discretion in denying

Bell's motion to suppress and admitting the evidence. Even if Bell had addressed the

issue, his arrest was justified under Article 14.04. We overrule Bell's first issue.[7]

## II.     Right Against Self-incrimination

In his second issue, Bell contends the State violated his constitutional right

against self-incrimination by referencing Bell's silence during police questioning.

We conclude even if Bell's right was violated, he has not demonstrated the harm

required to overturn his conviction.

---

[7] In his motion-to-suppress argument, Bell generally asserts he was questioned without cause and in violation of *Miranda*. The defendant bears the initial burden of proving a statement was the product of "custodial interrogation." *Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007). However, Bell has not identified any specific instance of unlawful interrogation, nor has he identified any specific statements that implicated the right against self-incrimination. Furthermore, Bell's DART Police interview was not offered into evidence at trial, and Bell did not testify. Accordingly, any alleged unlawful interrogation could not possibly have contributed to the jury's deliberations. There is no basis for error or harm. *See Jones v. State*, 119 S.W.3d 766, 777 (Tex. Crim. App. 2003) (violation of *Miranda* is constitutional error subject to review under Rule 44.2(a)'s standard); *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007) (emphasis of Rule 44.2(a) harm analysis is the likelihood the constitutional error was actually a contributing factor in the jury's deliberations in arriving at that verdict). To the extent Bell complains about Detective Carlson's comment regarding Bell's refusal to sign the *Miranda* warning card, we address that issue below.

"When a prosecutorial remark impinges upon an appellant's privilege against self-incrimination under the constitution of Texas or of the United States, it is error of constitutional magnitude." *Knowles*, 2022 WL 3714516, at \*4 (quoting *Snowden v. State*, 353 S.W.3d 815, 818 (Tex. Crim. App. 2011)). Similarly, a comment on a defendant's post-arrest silence violates the prohibition against self-incrimination because it is akin to a comment on a failure to testify and raises an inference of guilt arising from the invocation of a constitutional right. *Id.* (citing *Dinkins*, 894 S.W.2d at 356).

Because the error affects constitutional rights, we analyze harm under Texas Rule of Appellate Procedure 44.2(a). *Id.* (citing *Snowden*, 353 S.W.3d at 821–22). Rule 44.2(a) requires reversal in cases involving constitutional error "unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a).

Although error is not harmless simply because the reviewing court is confident the result the jury reached was objectively correct, "the presence of overwhelming evidence of guilt is a factor to be considered." *Knowles*, 2022 WL 3714516, at \*4 (citations omitted). Other non-exclusive factors we may consider include the nature of the error, whether the error was emphasized by the State, the probable implications of the error, and the weight the jury would likely have assigned to the error during deliberations. *Id.* (citations omitted). We review the record to determine whether beyond a reasonable doubt the particular error did not

contribute to the conviction or punishment. *Id.* (quoting *Snowden*, 353 S.W.3d at 822)). Constitutional error does not contribute to the conviction or punishment if the conviction and punishment would have been the same even if the erroneous evidence had not been admitted. *Id.* (citing *Clay v. State*, 240 S.W.3d 895, 904–05 (Tex. Crim. App. 2007)).

> Here, during Detective Carlson's testimony, the State inquired:
>
> Q. …Lawrence Bell's brought in for questioning; is that right?
>
> A. That's correct.
>
> Q. And how did that go?
>
> A. He refused to sign the *Miranda* card, so we didn't have much of a conversation.
>
> [Bell's counsel]: Objection, Your Honor, comment on my client's right to remain silent.
>
> THE COURT: Overruled.

The State then moved on to other topics and did not ask any further questions regarding Bell's conversations with police.

The State agrees the testimony referred to Bell's right to remain silent. Accordingly, we assume the testimony impinged upon Bell's right against self-incrimination and proceed to the harm analysis under Rule 44.2(a). Applying the relevant factors, we conclude any error in overruling Bell's objection was harmless.

We first note the State did not emphasize the error. Detective Carlson's statement regarding Bell's refusal to sign the *Miranda* card was the only reference to Bell's silence. And, after Bell objected, the State abandoned any additional

–20–

questions regarding the interview or Bell's silence. The State did not raise the topic again during the remainder of trial or during closing arguments. Thus, the risk the jury inferred Bell's guilt from Detective Carlson's comment was low. *See Knowles*, 2022 WL 3714516, at \*5 (citing *Thompson v. State*, 426 S.W.3d 206, 212 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (isolated comment about defendant's failure to testify was harmless)).

The nature of the error (erroneous admission of evidence) and the implications flowing therefrom are slight, considering the weight the jury would likely have assigned to the error during its deliberations. *See id.* Detective Carlson's comment came on day two of a three-day trial, in the middle of lengthy testimony by Carlson focused on the DART murder and the circumstances leading to Bell's arrest. Bell's silence was not referenced again throughout trial. Bell provides no argument as to why or how the jury assigned any weight to Carlson's comment during its deliberations.

Furthermore, the evidence of Bell's guilt was substantial. *See Snowden*, 353 S.W.3d at 825; *Knowles*, 2022 WL 3714516, at \*6. The jury viewed the DART train video of the murder, showing Bell wearing brown coveralls, a greenish beanie, black gloves, and boots, and carrying a black backpack. Additional videos showed Bell using the DART rail system in the hours leading up to the murder, and even showed Bell and the victim at the same platform less than an hour before the shooting. Bell's face was seen in another video from that same evening. Extended review of DART

rail videos and the interviews of homeless shelter employees led Detective Carlson to create the BOLO for Bell. Officer Neal then located Bell on a DART train wearing nearly identical clothes to the suspect in the DART videos. Police recovered a .45-caliber, 1911-style handgun from Bell's coveralls. This matched the caliber recovered from the victim, and a firearms examiner linked the cartridge casing recovered at the crime scene to Bell's weapon. Police also recovered additional handgun magazines, .45-caliber ammunition, and a green muti-colored beanie from Bell's black backpack. A jury receiving all this evidence would have no need to resort to any improper inference derived from Bell's failure to testify. Given the record, it is unlikely the jury placed much, if any, weight on Bell's failure to testify. *See Thompson*, 426 S.W.3d at 213.

Finally, we note the charge instructed the jury "the defendant has elected not to testify, and you are instructed that you cannot and must not refer or allude to that fact throughout your deliberations or take into consideration for any purpose whatsoever as a circumstance against the defendant." We presume the jury followed this instruction. *Id.* (citing *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998)).

Bell states in conclusory fashion this purported violation "constitutes clear harmful and reversible error" sufficient to overturn his conviction. However, he does not provide any substantive argument in support or analyze any relevant factors.

On this record and considering the foregoing factors, we conclude beyond a reasonable doubt the admission of Detective Carlson's testimony referring to Bell's post-arrest silence did not contribute to Bell's conviction. *See* TEX. R. APP. P. 44.2(a); *Knowles*, 2022 WL 3714516, at \*7 (officer's testimony about defendant's lack of a response when questioned about being charged with methamphetamine possession did not contribute to defendant's conviction, even if trial court erred by failing to sustain defendant's Fifth Amendment objection); *Thompson*, 426 S.W.3d at 213 (any error by the trial court in overruling defendant's objection to the State's reference to defendant's failure to testify was harmless). We overrule Bell's second issue.

## CONCLUSION

We conclude the trial court did not abuse its discretion in denying Bell's motion to suppress evidence. Bell procedurally defaulted by not addressing the trial court's ruling that Bell's arrest was authorized under Article 14.04 of the Code of Criminal Procedure. And, even if Bell had addressed the issue, we similarly conclude Bell's arrest was authorized under Article 14.04. Finally, even if testimony by the State's witness violated Bell's right against self-incrimination, the record does not demonstrate reversible error under Rule 44.2(a).

Accordingly, we affirm the trial court's judgment.

/Robbie Partida-Kipness/
ROBBIE PARTIDA-KIPNESS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b).
230331F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

LAWRENCE EDWARD BELL,
Appellant

No. 05-23-00331-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 401st Judicial
District Court, Collin County, Texas
Trial Court Cause No. 401-81917-
2022.
Opinion delivered by Justice Partida-
Kipness. Justices Nowell and Smith
participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 30th day of May, 2024.